In the Matter of Allison E. MENDEL, Regarding contempt citations issued in Bock v. Felbert, Superior Court No. 3AN–92–4375 CI.

No. S–5741.

Supreme Court of Alaska.

June 16, 1995.

---

Susan Orlansky and Sandra Saville, Alaska Civ. Liberties Union, Anchorage, for appellant.

Vincent Vitale, Anchorage, for George W. Bock, Jr., Tiffany Bock, and Christina Bock, real parties in interest.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and EASTAUGH, J., not participating.

### ORDER

On consideration of the motion for full-court reconsideration filed on March 31, 1995,

IT IS ORDERED:

1. Opinion No. 4184 published on March 31, 1995, is WITHDRAWN.

2. Opinion No. 4223 is issued on this date in its place.

Entered by direction of the court at Anchorage, Alaska on June 16, 1995.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and EASTAUGH, J., not participating.

### OPINION

RABINOWITZ, Justice.

This case requires us to review the propriety of contempt citations against Allison E. Mendel. Mendel, an attorney, was held in contempt of court for her refusal to answer numerous questions at an in-court deposition.

## I. FACTS AND PROCEEDINGS

### A. General Background

In *Bock v. Bock*, 824 P.2d 723 (Alaska 1992), we vacated a superior court's custody award of Laura and George Bock's twin daughters to their mother, Laura. In *Bock*, we held that because Kentucky had retained jurisdiction over the custody matter, the Alaska superior court was precluded from exercising jurisdiction by the continuing jurisdiction provisions of the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A (1988). *Id.* at 725. We also ordered the superior court to enforce a Kentucky decree granting custody of the children to their father. *Id.* at 726.

Rather than turning over custody of the children to their father, Laura went into hiding with the two girls.[1] She also brought suit in federal court against George and this court seeking to set aside our order.[2] Mendel represents Laura in this federal litigation.

In May 1992 George commenced *Bock v. Felbert*, No. 3AN–92–4375 CI (Alaska Super. filed May 19, 1992), in the superior court at Anchorage. In this action George asserted various claims for custodial interference in violation of AS 25.20.140, common law interference with custodial rights, conspiracy to interfere with custodial rights, the tort of outrage, conspiracy to cause intentional infliction of emotional distress, false imprisonment, and punitive damages. George's complaint names Laura and ten other defendants who he alleges assisted Laura in hiding the

---

1. On approximately the date when this court's opinion in *Bock v. Bock* was published, Mendel became Laura's attorney for purposes of regaining legal custody of the children. Mendel is still counsel for Laura.

2. In this federal suit Laura argued that the continuing jurisdiction provisions violated the due process clause of both the Fifth and Fourteenth Amendments. On December 9, 1994, the Ninth Circuit Court of Appeals issued an order affirming the district court's dismissal of this action. *Bock v. Bock*, No. 94–35647 (9th Cir. Dec. 9, 1994) (order granting summary affirmance of district court's May 24, 1994 order).

children. Mendel is not a named defendant in the *Felbert* litigation.[3]

## B. *The Deposition*

In February 1993, in the *Felbert* litigation, George subpoenaed Mendel for the purpose of taking her deposition. The subpoena also requested Mendel to bring with her numerous documents in connection with her representation of Laura. Mendel moved to quash the subpoena. After a hearing, the superior court rejected Mendel's claims of privilege, relevancy, and that some of the information was protected from disclosure by the First Amendment. Accordingly, the court ordered her to attend the deposition and produce the requested documents. Mendel appeared for the deposition on April 15, 1993. She refused to answer certain questions and refused to produce copies of her billing records other than a copy of the billing headings. (The bills Mendel proffered were redacted.) Mendel answered questions regarding when she had last seen Laura in person and on other matters not relevant to this appeal.

## C. *The Contempt of Court Rulings*

George subsequently moved for an order requiring Mendel to show cause why she should not be held in contempt for violating the court's order by refusing to answer questions during the deposition. The superior court entered an order to show cause and a hearing was held. At George's request, the superior court opted to continue Mendel's deposition in its presence. At the show cause-deposition proceeding Mendel answered numerous questions.[4] During the course of the show cause-deposition proceeding Mendel was held in contempt on five separate occasions for her refusal to answer questions and was ordered to produce specific documents. The questions at issue are as follows:

(A) *"Did you ever receive phone calls from Laura Bock or to Laura Bock in which she gave you authority to proceed on behalf of her in federal court?"*

Mendel agreed to answer questions as to when she had last spoken to Laura, but refused to answer questions regarding the content of any of their conversations. Through her attorney, Mendel also asserted that the question had no relevance to any issue in the *Felbert* litigation. The superior court held that the attorney-client privilege did not apply to this "limited question" and held Mendel in contempt for refusing to answer.

(B) *"What words did Carolyn Johnson speak that led you to believe she was Laura Bock's representative?"*

After being directed by the court to answer this question, Mendel responded "I can't answer it on the basis of the attorney-client privilege." She also objected because the question wasn't material to any issue in

---

3. Following oral argument on this case, Laura and the children were located, and the children were placed in George's custody. Thereafter, Mendel filed a motion to dismiss this appeal as moot. This appeal is not moot. George Bock has not dismissed his claims for custodial interference and therefore discovery may continue in this action.

4. In her brief, Mendel described her testimony at the show cause-deposition proceeding as follows:
  Ms. Mendel testified that, to the best of her recollection, her last telephone communication from Ms. Bock was in approximately September or October, 1992. She reiterated that she had not seen Ms. Bock since early February, 1992, and she had never known where Ms. Bock was or how to contact her. She testified that, in their first meeting, Ms. Bock did not indicate she intended to hide the children from her ex-husband.
  Ms. Mendel testified that she receives instructions about her representation orally from Ms. Bock when Ms. Bock calls her. She testified that Laura Bock has no "spokesperson."
  Ms. Mendel testified that she considers Carolyn Johnson an agent or representative of Laura Bock, primarily because Ms. Johnson pays the legal bills for Ms. Mendel's representation of Laura Bock.* Additionally, Ms. Mendel testified, she has an attorney-client relationship with Ms. Johnson, apart from her status as representative or agent for Ms. Bock. Ms. Mendel testified that she has never known whether Ms. Johnson knew how to communicate with Ms. Bock. There is no one other than Ms. Johnson and other attorneys who have represented Ms. Bock whom Ms. Mendel considers to be an agent or representative of Ms. Bock.
  *Ms. Johnson's association with ... [Ms. Bock] was well known to Mr. Bock before the deposition.
  (Footnote in original) (record citations omitted).

the *Felbert* litigation.[5] The superior court then ruled, "Very well. Again, I find you in contempt."

(C) *"Once you learned that you might have an opportunity to talk to [a Representative of] Street Stories, [a CBS television show,] did you obtain authority from Laura Bock to speak to the news media from New York?"*

Mendel refused to answer this question. Her counsel argued that it was not relevant to locating the children or any issue in *Felbert,* and that it was protected by the attorney-client privilege. The superior court directed Mendel to answer the question. Mendel replied, "I can't answer the question based on the attorney-client privilege." The superior court then ruled, "Failure to answer is an act of contempt...."

(D) *"[S]tate the names of any people reflected on the billing record with whom you've had conversations concerning this matter, excluding Carolyn Johnson and Laura Bock."*

Mendel's counsel instructed her not to answer the question based on both the attorney-client privilege and the attorney work product doctrine. The superior court then remarked in part: "I think that this whole matter is probably better served by taking a fairly broad view.... [T]he rules of privilege and confidentiality have to be viewed in light of the potential on-going felony and that's going to guide my rulings." The court then required Mendel to answer the question. Mendel refused based on the attorney-client privilege and the work product doctrine. Mendel was found in contempt.

(E) *"Produce[ ] ... [your billing records to Laura] in their entirety."*

Mendel invited the superior court to review *in camera* the unredacted billings she had brought to the hearing. The superior court declined to review the billings *in camera,* stating

it's one of the vices of in-camera reviews, not being intimately familiar with every twist and turn that this case has or may take ... it's not automatically clear that,—to me, that I'm going to recognize strict relevance. So I'm going to produce them.... [A]re there any use restrictions [or] confidentiality orders you wish to have me place on Mr. Vitale before I give them to him?

Mendel objected to producing her entire billing records on the basis that they contained narrative statements detailing her legal representation of Laura and thus were protected by the attorney-client privilege. Additionally, Mendel objected on the ground that the records contained no information which was relevant to the *Felbert* litigation or locating the children. The superior court ordered Mendel to produce the billing records in their entirety. However, the court stayed the order pending the outcome of this appeal.

(F) *"[I]dentify ... anyone who purchased Laura Bock T-shirts through your office."*

Mendel argued that contributors to the Laura Bock Defense Fund have a First Amendment right not to be identified. Mendel's objection was overruled and she was held in contempt.

■ This appeal followed from the oral rulings of contempt.[6]

## II. *DISCUSSION* [7]

### A. *Relevancy—Questions (A), (B), and (C)*

■ Mendel argues that the answers to questions (A), (B), and (C), each of which

---

5. Mendel did not raise the relevance objection when asked this specific question at the hearing. She did, however, argue that this line of questioning was immaterial in her written Response to Motion for Order to Show Cause filed on May 7, 1993.

6. Alaska Civil Rule 90(a) requires that the court sign and enter an order of contempt, reciting the requisite facts.

7. Determining whether categories of information are attorney-client privileged or work product is a question of law determined *de novo. Langdon v. Champion,* 752 P.2d 999, 1001 (Alaska 1988). Whether information is protected by the First Amendment presents a constitutional question which is also determined *de novo. See Arco Alaska, Inc. v. State,* 824 P.2d 708, 710 (Alaska 1992); *see also Beard v. Baum,* 796 P.2d 1344, 1351–52 (Alaska 1990).

concerned whether Mendel had authorization from Laura to represent her, could not possibly lead to the discovery of the whereabouts of Laura or the children, nor were they relevant to any issue in *Felbert.* If the discovery questions were not relevant then Mendel "should not be subject to indefinite incarceration for her failure to provide irrelevant information."

Because this contempt citation arises out of the failure to comply with a discovery request, our determination as to whether the information sought is relevant is necessarily guided by Alaska Civil Rule 26(b)(1). *See Doe v. Superior Court,* 721 P.2d 617, 620–21 (Alaska 1986); *Hazen v. Municipality of Anchorage,* 718 P.2d 456, 460–61 (Alaska 1986). Civil Rule 26(b)(1) permits discovery of

> any matter, not privileged, which is relevant to the subject matter involved in the pending action.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Even under this broad view of relevancy, we are convinced by Mendel's argument. The subject of Mendel's authority to represent Laura is simply not relevant to any inquiry George might pursue in relation to the *Felbert* litigation. Nor do these questions appear reasonably calculated to lead to the discovery of admissible evidence. Finally, George provides no explanation as to the nexus between the information sought and his efforts to locate his children.[8] We therefore hold that Mendel's convictions of contempt for her failure to answer questions (A), (B), and (C) must be set aside. *See Hazen,* 718 P.2d at 460–61 (reversing the trial court's

imposition of sanctions for failure to comply with discovery order after concluding that information sought was irrelevant).

### B. Attorney–Client Privilege—Questions (A), (B), and (C)

■ As indicated above, the superior court rejected Mendel's claim of attorney-client privilege with respect to questions (A), (B), and (C). On appeal, George does not contest the applicability of the attorney-client privilege as to each question.

Alaska Evidence Rule 503(b) provides in part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client or the client's representative and the client's lawyer or the lawyer's representative....

Evidence Rule 503(b) gives effect to the policy which underlies the attorney-client privilege. As discussed in *United Services Automobile Ass'n v. Werley,* 526 P.2d 28 (Alaska 1974), "[t]he purpose of the attorney-client privilege is to promote the freedom of consultation of legal advisors by clients by removing the apprehension of compelled disclosure by the legal advisors." *Id.* at 31 (footnote omitted). It is apparent that requiring Mendel to answer questions (A), (B), and (C) would have required disclosure of confidential communications made for the purpose of facilitating the rendition of professional legal services to Laura.

■ George takes the position that the privilege is vitiated because Mendel's services "were sought, obtained or used to en-

---

Generally, this court reviews discovery orders under a deferential abuse of discretion standard. *Jones v. Jennings,* 788 P.2d 732, 735 (Alaska 1990). However, whether the superior court weighed appropriate factors is a legal question to which this court applies its independent judgment. *See Hayes v. Xerox Corp.,* 718 P.2d 929, 941 (Alaska 1986); *Munns v. Volkswagenwerk, A.G.,* 539 P.2d 1180, 1181 (Alaska 1975).

Determining relevancy is within the trial court's discretion. *Doe v. Superior Court,* 721 P.2d 617, 620 (Alaska 1986). This court will reverse a grant of discovery attacked on relevan-

cy grounds "only if the information sought could not reasonably be expected to lead to the discovery of admissible evidence." *Doe,* 721 P.2d at 620–21.

8. As noted *supra* note 3, the children have been found and are currently in the custody of their father. However, we judge the relevance of the information sought, and hence the propriety of the contempt citation, based on the factual circumstances at the time of the superior court's ruling.

able or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud...." [9] In *Munn v. Bristol Bay Housing Authority*, 777 P.2d 188 (Alaska 1989), we noted that:

> In *Werley*, we ruled that the attorney-client privilege cannot be used to protect communications regarding the commission of a crime or civil fraud occurring during or after the establishment of the attorney-client relationship.... The privilege can be defeated if the party seeking to discover communications between the attorney and the client "present[s] prima facie evidence of the perpetration of a fraud or crime in the attorney-client relationship."

*Id.* at 195 (footnote omitted). The privilege only ceases to exist for ongoing and future wrongdoing, not past wrongdoing. *Werley*, 526 P.2d at 32. "[T]he privilege is designed to encourage those who may have committed a prior wrong to seek protection of their rights," which is why this court distinguishes between past and ongoing or future wrongdoing. *Munn*, 777 P.2d at 195. In essence, "[t]he attorney-client privilege is not designed to encourage those planning to commit a wrong to obtain legal assistance in their endeavor." *Id.* Significantly, "[a]lthough the fraud or crime must have been contemplated by the client at the time of the communication, it is irrelevant whether the attorney was aware of the client's purpose." *Id.* (citation omitted); *see also* 1 Charles T.

McCormick et al., *McCormick on Evidence* § 95 (John W. Strong ed., 4th ed. 1992). "Once a litigant has presented prima facie evidence of the perpetration of a fraud or crime in the attorney-client relationship, the other party may not then claim the privilege as a bar to the discovery of relevant communications...." [10] *Werley*, 526 P.2d at 32–33 (footnotes omitted).

In the case at bar, review of the record demonstrates that George failed to establish a prima facie case of crime or fraud in the attorney-client relationship which would abrogate the privilege. [11] We therefore hold that the superior court's contempt rulings against Mendel based on her failure to answer questions (A), (B), and (C) should be vacated on the additional ground that the attorney-client privilege is applicable to each question and the privilege was not lost under the crime/fraud exception to the attorney-client privilege. [12]

## C. *Questions (D) and (E)*

We next address the merits of the superior court's order to produce Mendel's billing records in their entirety and its contempt ruling for Mendel's refusal to "[s]tate the names of any persons reflected on the billing records with whom [she] had conversations concerning this matter, excluding Carolyn Johnson and Laura Bock." Mendel argues that this information constitutes attorney work product. [13] As such, the superior

---

**9.** Alaska R.Evid. 503(d)(1).

**10.** "A prima facie case is one in which the evidence in one's favor is sufficiently strong for his opponent to be called on to answer it. This definition can be rephrased as requiring that the evidence in favor of a proposition be sufficient to support a finding in its favor, if all the evidence to the contrary be disregarded." *Werley*, 526 P.2d at 32 n. 15.

**11.** We note that the record is devoid of any finding by the superior court that a prima facie case of crime or fraud in the attorney-client relationship had been established.

**12.** George cites several similar cases from other jurisdictions in support of his argument that the crime/fraud exception applies. George cites *Bersani v. Bersani*, 41 Conn.Supp. 252, 565 A.2d 1368 (1989); *Jafarian–Kerman v. Jafarian–Kerman*, 424 S.W.2d 333 (Mo.App.1967); *In the*

*Matter of Jacqueline F.*, 47 N.Y.2d 215, 417 N.Y.S.2d 884, 391 N.E.2d 967 (App.1979); and *Dike v. Dike*, 75 Wash.2d 1, 448 P.2d 490 (1968). Although each of these cases also involves a parental or guardian kidnapping, each is distinguishable from the instant case. In each case, the attorney was compelled against his/her will to divulge the address of the client. In the instant case, Mendel has acknowledged that she would have to divulge Laura's location if she knew where Laura was or the name of anyone she knew who knew Laura's location. Mendel stated, "I don't know those things, and I have never wanted to know those things. And I've been very clear with everyone that if they tell me I will tell."

**13.** While only question (E) required production of documents and the work product doctrine applies only to documents, Mendel makes a compelling argument for applying the work product doctrine to question (D). By requesting Mendel

court violated Civil Rule 26(b)(3) by compelling production of her attorney work product without adopting measures to assure that protected information was not disclosed.

Alaska Civil Rule 26(b)(3) provides:

*Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. *In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation.*

(Emphasis added.)

As provided in the rule, discovery of an attorney's work product may be had under Rule 26(b)(3), but the court has a mandatory duty to protect against disclosures of the "mental impressions, conclusions, opinions or legal theories" of the litigating attorney. Mendel argues that the names contained in her billing records to Laura and the detailed billings consisting of narrative descriptions would afford George insight into Mendel's handling of Laura's case.

In interpreting the analogous Federal Rule of Civil Procedure, the United States Supreme Court held that work product which reflects an attorney's thought processes should only be disclosed in rare situations, and should not be disclosed simply upon a showing of substantial need and inability to obtain the equivalent without undue hardship. *Hickman v. Taylor,* 329 U.S. 495, 510–12, 67 S.Ct. 385, 392–94, 91 L.Ed. 451 (1947).

On the other hand, according to Professor Moore, a litigant may generally seek the "identity and location of persons having knowledge of any discoverable matter" without violating the work product doctrine or the attorney-client privilege. 4 James W. Moore et al., *Moore's Federal Practice,* ¶ 26.57[2] (2d ed. 1993).

Here, Mendel proposed a compromise which would disclose the names of those individuals who might have knowledge of discoverable matter without revealing Mendel's litigation strategies. Mendel offered her unredacted billing records to the superior court for *in camera* review. However, the superior court declined this offer and instead ordered production of the billing records.

On this record we hold that the superior court abused its discretion in declining to conduct an *in camera* review of the unredacted billing records. *See Federal Savings & Loan Ins. Co. v. Ferm,* 909 F.2d 372, 374 (9th Cir.1990) (*in camera* review by court is a method of protecting attorney thought processes and confidential communications from intrusions). We therefore hold that the contempt adjudication against Mendel for her failure to answer question (D) and the order to produce the unredacted billing records must be vacated and set aside.

■ For future reference in other similar cases, we note here the appropriate procedure for the superior court to follow in conducting its *in camera* review. The trial judge should redact the attorney's mental impressions, conclusions, opinions or legal theories as well as any privileged attorney-client communications which are unrelated to the subject matter of the litigation. The court should then give the attorney the opportunity to examine the redacted records and make any arguments as to why any of the unredacted material is subject to the absolute privilege discussed in Rule 26(b)(3). Only at this point should the relevant, unprivileged information be produced.

D. *Question (F)*

■ Question (F) required Mendel to "[I]dentify ... anyone who purchased Laura

to read from her records, counsel for George was

essentially asking her to produce the document.

Bock T-shirts through your office." Mendel asserts that "people who contributed to a political cause, such as the Laura Bock Defense Fund, have a protected First Amendment interest in their association and should not be subject to having their names disclosed absent a compelling competing interest." Mendel additionally argues that the superior court erred by not conducting a "more thoughtful analysis of the competing interests" and that "[t]he likelihood that T-shirt purchasers had information relevant to Laura Bock's location was so small it did not justify denying contributors their First Amendment privacy rights."

George counters that the T-shirt purchasers are relevant to his search for the children; that they had no expectation of privacy; that through their purchase, they aided Laura in her crime; that the purchases were not speech and even if they were, they were commercial speech entitled to lesser protection; that no rights of association exist because the underlying activity is unlawful; and that his need for their names is compelling and should outweigh any constitutional interests of the T-shirt purchasers.[14]

■ The right to associate is a fundamental right protected by the First Amendment and the due process clause of the Fourteenth Amendment. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). The United States Supreme Court has recognized "the vital relationship between freedom to associate and privacy in one's associations," and

has noted that compelled disclosure of membership lists of advocacy groups effectively restrains freedom of association. *Id.* at 461–62, 78 S.Ct. at 1171–72.

■ Mendel correctly argues that the T-shirt purchasers are members of a group or association protected by the First Amendment. A federal appellate court has held that contributors to a "Voluntary Fund" established by a trade union were entitled to First Amendment protection after focusing on the Fund's activities. *Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349 (9th Cir.1988). The court held that use of the Fund for "scholarships, charitable contributions, and political purposes," was protected by the First Amendment. *Id.* at 349. Likewise, supporting the legal action of Laura is lawful speech entitled to protection under the First Amendment. Simply because the purchaser received a T-shirt does not convert the right of association implicated into a mere commercial relationship, as suggested by George.[15]

We reject George's argument that no right of association exists because the purpose of the underlying activity was "unlawful." T-shirt purchasers neither furthered Laura's crime nor conspired to interfere with George's custodial rights by the simple act of purchasing a T-shirt or contributing to the Laura Bock Legal Defense Fund. According to Mendel, proceeds from T-shirt sales were deposited into her general client trust account. Laura never received any of this

---

**14.** While Mendel concedes that the T-shirt purchaser's names may be discovered, she argues that the superior court failed to weigh all the relevant factors before ordering disclosure. Although the precise formulation of the balancing tests used by each of the federal circuits varies, the factors considered by federal courts in determining whether to permit discovery of First Amendment-protected lists of names include:

  (1) whether the information sought can be obtained from alternative sources;
  (2) whether the party seeking the information has made reasonable efforts to obtain the information from other sources; and
  (3) whether the information requested is truly essential to the party's preparation or defense of the lawsuit.

*E.g., Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir.1987); *International Union, United Auto., Aerospace and Agric. Implement Workers*

*of Am. and its Locals 1093, 558 and 25 v. National Right to Work Legal Defense and Educ. Found., Inc.*, 590 F.2d 1139, 1152 (D.C.Cir.1978).

**15.** George claims that the T-shirt purchasers were not engaged in political speech, and were not promoting social, economic, educational, religious or cultural ends. This argument has no merit. George also argues that no right of association exists because the purchasers did not have a highly personal relationship. While highly personal relationships are constitutionally protected in one line of United States Supreme Court decisions, such a relationship is not a prerequisite for protection of the right to associate based upon the First Amendment. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984). Therefore, this argument is inapposite.

money, so she could not have used it to finance her flight. Presumably, T-shirt purchasers either sought the T-shirt for its message or sought to subsidize the lawful pursuit of a legitimate federal action, or both. Neither activity is unlawful.

This brings us to the final aspect of this issue. Federal courts have held that when lists of names protected by the First Amendment must be disclosed, the court must take steps to minimize infringement of the members' First Amendment rights. *Brock*, 860 F.2d at 350; *Savola v. Webster*, 644 F.2d 743, 746–47 (8th Cir.1981). We have endorsed *in camera* review as an appropriate means for protecting privacy interests by exclusion of prejudicial and irrelevant information. *Jones v. Jennings*, 788 P.2d 732, 739 (Alaska 1990).

Once again, for future reference, we note here several alternative procedures which the superior court could have employed to discern between the names of persons who contributed to the Laura Bock Legal Defense Fund and were in possession of relevant information, and those persons whose names should not have been disclosed. First, Mendel suggests that in an *in camera, ex parte* interrogation, the superior court could have asked her if she recalled which T-shirt purchasers-contributors were Laura's acquaintances, and which were Mendel's friends and associates. Second, Mendel suggests that the superior court could have directed George to develop a short questionnaire for Mendel to distribute to the T-shirt purchasers for them to answer at the request of the superior court. "If the purchasers stated they did not know [Laura] and had no information as to her whereabouts, there would be no need to disclose the names to [George]. If a particular purchaser indicated he or she did have information relevant to [Laura's] current whereabouts, then arguably [George's] interest in that information would outweigh that particular purchaser's privacy interests, and that name should be disclosed." Another approach would have the superior court, in its *in camera, ex parte*

questioning of Mendel, obtain from her the names of all T-shirt purchasers of whom she is aware. The superior court could have then examined these persons *in camera* to ascertain what information they possessed, if any, concerning the whereabouts of Laura and the two children.

In short, it is within the sound discretion of the superior court to devise measures to minimize any infringement of the T-shirt purchasers' First Amendment associational rights. However, in light of the superior court's failure to undertake any measures to minimize the potential infringement of the T-shirt purchasers' First Amendment rights we conclude that the superior court's decision to hold Mendel in contempt for her failure to identify purchasers of the T-shirts must be vacated and set aside.

## III. *CONCLUSION*

Mendel's contempt convictions for her refusal to answer questions (A), (B), and (C) are reversed, vacated, and set aside. Mendel's contempt convictions for her refusal to answer questions (D) and (F) as well as the superior court's order requiring Mendel to turn over her unredacted billing records are reversed, vacated, and set aside and the matter remanded to the superior court for further proceedings consistent with this opinion.[16]

---

**16.** We note that in issuing its contempt citations, the trial court stated "the rules of privilege and confidentiality have to be viewed in light of the potential on-going felony and that's going to guide my rulings." Should George pursue discovery on these matters, nothing in this opinion should be read to prevent the trial court from reconsidering its earlier decision in light of the changed circumstances.