Samuel PETER, Sr., individually and as father and next friend of Samuel Peter, Jr., Petitioners,

v.

The PROGRESSIVE CORPORATION and Progressive Northwestern Insurance Company, Respondents.

No. S–8608.

Supreme Court of Alaska.

Aug. 27, 1999.

David Karl Gross, Law Offices of Murphy L. Clark, Anchorage, for Petitioners.

Gary A. Zipkin and Susan M. West, Guess & Rudd, P.C., Anchorage, for Respondents.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. *INTRODUCTION*

After receiving a total of twelve interrogatories from the plaintiffs in a lawsuit alleging bad faith in the delay of underinsured motorist payments, the defendant insurer asked the superior court to appoint a discovery master to handle all future discovery disputes. The court granted the request and ordered that the master's fees be paid by the losing party in each discovery dispute. The plaintiffs appeal, claiming that use of discovery masters is unfair to financially disadvantaged parties. We vacate the superior court's order and remand for determination of whether a master is appropriate in this case in light of various factors that we outline below.

## II. *FACTS AND PROCEEDINGS*

In March 1995 an automobile driven by Cynthia Pack struck eight-year-old Samuel Peter, Jr. while he was crossing the street.

In June 1996 Samuel Jr. and his parents, Donita and Samuel Sr., sued Pack for Samuel Jr.'s injuries. Pack, in turn, filed a counterclaim against Donita, alleging that she negligently failed to supervise her son.

The Peters have an automobile insurance policy with Progressive Northwestern Insurance Company. In December 1997 Samuel Sr., on his own behalf and on behalf of Samuel Jr., sued Progressive, Progressive's agent Dan Woodruff, and Last Frontier Insurance, their insurance broker, alleging that Progressive committed bad faith and breach of fiduciary duty by denying knowledge that Donita was insured in the hopes that the Peters would not make a claim. Progressive denied all allegations.

One day after filing their complaint, the Peters served Progressive and its agents with three discovery requests consisting of a total of twelve interrogatories. One month later, in February 1998, Progressive moved for a protective order precluding the Peters from disclosing "any confidential or proprietary information produced by Progressive" to third parties. The Peters filed a forty-one-page opposition with over one hundred pages of exhibits. The next day, Progressive moved for appointment of a discovery master to resolve disputes. Progressive requested that the losing party pay the master's fees within ten days of the resolution of each individual discovery dispute. The Peters opposed the motion, arguing that appointment of a master would give Progressive a strategic advantage and would deprive the Peters of meaningful access to the justice system.

In April 1998 Superior Court Judge Harold M. Brown issued an order granting Progressive's motion and asked the parties to submit the name of a mutually acceptable discovery master. We granted the Peters' petition for review from this order.

## III. STANDARD OF REVIEW

[1, 2] We review the appointment of special masters pursuant to Alaska Civil Rule 53 for an abuse of discretion.[1] "We will find an abuse of discretion only when we are left with a definite and firm conviction after reviewing the whole record that the trial court erred in its ruling."[2] Although we also review discovery orders and sanctions for an abuse of discretion,[3] we review de novo the question of whether a trial court weighed the appropriate factors when issuing a discovery order.[4]

When interpreting the Civil Rules we exercise our independent judgment,[5] adopting the rule of law that is most persuasive in light of reason, precedent, and policy.[6] Similarly, we review constitutional questions de novo.[7]

## IV. DISCUSSION

The Peters' central argument in this appeal is that imposition of masters' fees unfairly infringes on nonwealthy litigants' access to civil justice. As the Peters point out, the text of Civil Rule 53 provides no guidance on when appointment of a discovery master is appropriate. To address the Peters' argument, then, we must determine the scope of trial courts' authority under Civil Rule 53 to appoint discovery masters and must consider whether the constitutional right of meaningful access to the court system[8] requires certain limitations on that authority.

---

1. See Dean v. Firor, 681 P.2d 321, 327 n. 8 (Alaska 1984). Progressive sought appointment of a discovery master pursuant to Alaska Civil Rule 53. Although Civil Rule 53 does not by its terms cover the use of discovery masters, we have referenced it when discussing discovery masters. See Gonzales v. Safeway Stores, Inc., 882 P.2d 389, 398 (Alaska 1994).

2. Christensen v. NCH Corp., 956 P.2d 468, 473 (Alaska 1998) (citing Stone v. International Marine Carriers, Inc., 918 P.2d 551, 554 (Alaska 1996)).

3. See id. (citing Stone, 918 P.2d at 554).

4. See In re Mendel, 897 P.2d 68, 72–73 n. 7 (Alaska 1995).

5. See Breck v. Moore, 910 P.2d 599, 608 (Alaska 1996).

6. See Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

7. See State, CSED v. Beans, 965 P.2d 725, 727 (Alaska 1998).

8. See Bush v. Reid, 516 P.2d 1215, 1218–21 (Alaska 1973). See generally discussion supra at IV.C.

Not only will our inquiry allow us to articulate basic principles to guide judges, attorneys, and litigants in the appropriate use of discovery masters, but it will also assist our Standing Advisory Committee on the Rules of Civil Procedure to address the use of discovery masters and propose changes to Civil Rule 53. In any case, our judicial duty to determine whether appointment of a master was appropriate in this case, and by implication whether certain limitations on the trial court's discretion in appointing a master may be justified, exists independent of the activities of the Civil Rules Committee.[9]

### A. Overview of Authority to Appoint Discovery Masters

#### 1. Alaska law

Alaska Civil Rule 53(a) governs the use of special masters in civil trials. It provides in part:

(a) *Appointment and Compensation.* The presiding judge of the superior court for each judicial district ... may appoint one or more standing masters for such district.... [T]he word "master" includes a referee, an auditor and an examiner, and a magistrate or a deputy magistrate. The compensation, if any, to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties or paid out of any fund or subject matter of the action which is in the custody and control of the court, as the court may direct....

(b) *Powers.* The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or

perform particular acts.... Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before the master and to ... take all measures necessary or proper for the efficient performance of the master's duties under the order.

Although we have not previously set forth guidelines for the use and appointment of special masters to supervise the discovery process, we have addressed generally the use of referees in lieu of judges for various purposes in civil trials. In *Dean v. Firor*,[10] the seminal Alaska case regarding the use of masters, we noted that the language in Federal Civil Rule 53(b), including the requirement that an "exceptional condition" justify the use of a master,[11] was "purposefully omitted from Alaska Civil Rule 53." [12] We acknowledged that the drafters of the Alaska rule may have "intended to allow the trial judges a more liberal use of masters than that allowed under the federal system" and that therefore "application of the extensive federal case law on this subject [is] inappropriate." [13]

Nevertheless, we decided that "[w]hile some jurisdictions may give trial judges a great deal of liberty in referring cases, we find a more restrictive view to be more appropriate." [14] We reasoned that the judiciary should be solely responsible for resolving questions of law, such as the claim for fraudulent conveyance at issue in *Dean,* and that a trial court should not reduce itself to the role of a "quasi-appellate court by simply reviewing the findings of the master." [15]

---

**9.** Moreover, the rulemaking process is a highly structured one and involves circulating proposals for public comment and study by the committee. *See* Alaska R. Admin. P. 44(a)-(j). Given that the trial court in this case has stayed all discovery pending the outcome of this appeal, it is especially important that we timely resolve the discovery master issue.

**10.** 681 P.2d 321 (Alaska 1984).

**11.** Federal Civil Rule 53(b) states in relevant part:

(b) *Reference.* A reference to a master shall be the exception and not the rule. In actions to

be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

**12.** *Dean,* 681 P.2d at 327.

**13.** *Id.*

**14.** *Id.* at 328.

**15.** *Id.*

We declined to address the propriety of appointing a discovery master in a more recent case involving the same attorney appearing for the plaintiffs in the present case, *Gonzales v. Safeway Stores, Inc.*[16] In *Gonzales*, the trial court had appointed a master due to "ongoing discovery disputes."[17] After the master had made several rulings, the plaintiff moved to discharge the master on the grounds that the fees "infringe[d] upon his access to the court and violate[d] his due process and equal protection rights."[18] But because the plaintiff did not object at the time of appointment, we concluded that he had waived the issue.[19] We also noted that trial courts generally have authority under Civil Rule 53 to appoint masters and fix their compensation.[20]

This case law, albeit limited, provides Alaska state courts with authority under Civil Rule 53 to use discovery masters in at least some circumstances. The harder task, and one that this case requires us to perform, is to define those circumstances in order to determine whether appointment of a discovery master was appropriate in this case.

### 2. *Sources other than Alaska law*

Some jurisdictions set forth criteria for determining the propriety of referring a discovery dispute to a master. For example, California's rule gives courts discretion to appoint a master over one party's objection only when "it is necessary for the court to appoint a referee to hear and determine any and all discovery motions and disputes."[21] California courts have interpreted this rule "to permit reference over the parties' objection where that procedure is *necessary*, not merely *convenient*."[22] A recently proposed

Michigan rule would allow courts to appoint discovery masters only if "there are complex or numerous discovery issues and a master's assistance would facilitate a more speedy and economical determination of those issues."[23]

Federal Rule of Civil Procedure 53 similarly requires that an "exceptional condition" exist before a master can be appointed.[24] Although this restriction does not exist in Alaska Civil Rule 53, we believe a discussion of the use of discovery masters in federal courts is still an important source of guidance given our endorsement of a restricted view of the use of masters in *Dean*. Alaska District Court Local Rule 53.1(a) allows courts to appoint discovery masters in order to

> assist the parties in the *speedy and economical conduct of discovery and resolution of discovery disputes*. As a condition of such appointment, and especially in *complex cases involving numerous, significant disputes*, the court may require the parties to pay the fees of the discovery master.

(Emphases added.) This provision discourages courts from forcing parties to pay for a referee unless the case is complex or time consuming, although the decision remains within the court's discretion. The Manual for Complex Litigation counsels that judges should reserve the use of masters for cases "where the financial stakes justify imposing the expense on the parties and where the amount of activity required would impose undue burdens on a judge. It is generally preferable to appoint special masters with

---

**16.** 882 P.2d 389 (Alaska 1994).

**17.** *Id.* at 398.

**18.** *Id.*

**19.** *See id.* at 399.

**20.** *See id.* at 398.

**21.** Cal.Civ.Proc.Code § 639(e) (West Supp.1999).

**22.** *Taggares v. Superior Court*, 62 Cal.App.4th 94, 72 Cal.Rptr.2d 387, 393 (1998) (second emphasis added).

**23.** David M. Lawson, *Annual Survey of Michigan Law: Evidence*, 44 Wayne L.Rev. 849, 900 n. 254 (1998).

**24.** Fed.R.Civ.P. 53(a); *see also* Margaret G. Farrell, *The Role of Special Masters in Federal Litigation*, C842 A.L.I.-A.B.A. Course of Study 931, 947 (1993) ("Where information sought in discovery is ... complex in nature, there is an even greater ground upon which to find exceptional conditions required for the appointment of a master under Rule 53.").

the parties' consent."[25] Special masters are "sometimes appointed" during discovery in "complex [federal] cases to limit massive discovery requests, to rule on claims of privilege and to make factual determinations necessary to rule on the admissibility of evidence."[26] A referee may be appropriate "where disclosure is complicated by an intractable opponent, discourteous and uncooperative attorneys, [or] constant rulings on disclosure disputes."[27]

Both federal and state courts have justified appointing discovery masters based on the contentious or unwieldy nature of discovery disputes. In one federal case in which the parties filed twenty-seven motions to compel or for protective orders, the court appointed a discovery master but acknowledged that "[t]he use of a special master in this district for the purpose of discovery management is an extraordinary event, occurring perhaps once a decade."[28] The court lamented that the "case is a mess because the lawyers are out of control."[29] Another federal court similarly appointed a discovery master because of what it described as the "acrimony" between counsel; the court believed this hostility "necessitate[d] the provision of day care for counsel who, like small children, cannot get along and require adult supervision."[30] The California Court of Appeal has approved use of discovery masters "to reduce [ ] the tension between contentious discovery disputants."[31]

■ Our research uncovers no universally applied list of factors for determining when a court's appointment of a discovery master is appropriate. Still, certain principles repeatedly surface in those authorities that have considered the issue. Based on a review of our own case law, the law of other

jurisdictions, academic literature, and policy considerations, we believe that appointment of a discovery master should generally be reserved for cases (1) where the issues are unusually complex or specialized; (2) where discovery is particularly document intensive; (3) where resolving discovery disputes will be especially time consuming; (4) where the parties are particularly contentious or obstructionist; or (5) where a master will facilitate a more speedy and economical determination of the case. We believe that these factors reflect a respect for the immense and often unreasonable burdens placed on trial courts' time and resources, while avoiding an undesirable shift in the role of trial courts to that of "quasi-appellate" courts.[32] Perhaps more importantly, the guidelines attempt to ensure nonwealthy litigants' access to the courts.

### B. Appointment of a Master as a Discovery Sanction

The factors we have just set forth are remedial and managerial in nature: Their goals are to assist parties having difficulty resolving discovery conflicts absent court intervention and to ensure a prompt resolution of a complicated or contentious discovery process by using masters to ease the burden on trial judges with hectic daily court schedules. Although courts may reasonably take into account parties' contentiousness when deciding to appoint a discovery master, the purpose for such an appointment should not be punitive. We agree with the Peters that the use of masters as a sanctioning tool potentially runs afoul of the procedural requirements of Civil Rule 37.

**25.** Manual for Complex Litigation, Third § 21.52 (3d ed.1995).

**26.** Farrell, *supra* note 25, at 947.

**27.** Raymond Powers, *Court–Appointed Referees: An (Underutilized) Adjunct to the Court, A Way Toward Better Management of Discovery*, 23 Westchester B.J. 97, 98 (1996).

**28.** *Mercer v. Gerry Baby Prods. Co.*, 160 F.R.D. 576, 579 (S.D.Iowa 1995).

**29.** *Id.* at 577.

**30.** *Van Pilsum v. Iowa State Univ. of Science and Tech.*, 152 F.R.D. 179, 181 (S.D.Iowa 1993).

**31.** *Taggares v. Superior Court*, 62 Cal.App.4th 94, 72 Cal.Rptr.2d 387, 388 (1998).

**32.** *Dean v. Firor*, 681 P.2d 321, 328 (Alaska 1984). The Civil Rules Committee should consider these factors, as well as any others it deems relevant after studying the issue, when drafting its recommendations for changes to Rule 53.

■ Civil Rule 37(g) allows courts to impose sanctions only after certain requirements are met:

> *Failure to Cooperate in Discovery or to Participate in the Framing of a Discovery Plan.* If a party or a party's attorney engages in unreasonable, groundless, abusive, or obstructionist conduct during the course of discovery ... the court may, *after opportunity for hearing,* require such party or attorney to pay to any other party the reasonable expenses, including attorney's fees, caused by the conduct.

(Emphasis added.) Similarly, a court may not force a losing party to pay for fees and costs with respect to a Rule 37(a) motion to compel unless the prevailing party has first made a good faith effort to obtain compliance without court action.[33] When a court appoints a master as a means of deterring future unreasonable discovery requests, it imposes a "sanction" while circumventing the requirements of Rule 37.

■ The Peters argue that *any* appointment of a discovery master is a back-door sanction without the attendant safeguards of Civil Rule 37, because parties are forced to pay the master's fees even for losing a reasonable, good-faith dispute. But unless the purpose of the master's appointment is punitive, payment of master's fees is no different than any other cost of litigation thrust upon parties.[34] Such inevitable costs generally implicate due process concerns only when they affect a litigant's meaningful access to justice.

Progressive contends that appointment of a master does not work as a sanction at all because both parties are subject to paying a master's fees if they lose a dispute. Progres-

sive also notes that one could make a similar argument against forcing parties to pay fees upon losing a good-faith motion to compel. But paying fees upon losing a single motion to compel is qualitatively different from paying a master to oversee the rest of the discovery process. Whereas the former is subject to Civil Rule 37 requirements and serves to compensate the other party for costs incurred, the latter has no proportionality requirement or procedural safeguard attached. And although Progressive's argument may be persuasive in the abstract, in a case like this, in which one party has substantially more financial resources than another, appointment of a master could disproportionately burden the party being sanctioned.

Some courts appear cautiously willing to use the discovery master as a sanctioning tool in certain circumstances. One federal court required an attorney, in response to his "Rambo Litigation" technique during a deposition, to pay for a new deposition as well as for a discovery master to supervise the deposition.[35] One commentator has suggested, albeit in a tongue-in-cheek article, that discovery masters should be used more often as a threat to quell discovery abuse.[36] Even so, given the language and spirit of Civil Rule 37, we agree with those courts that have discouraged the use of masters as a discovery sanction.[37]

### C. Circumstances in Which Courts May Require Parties to Pay a Discovery Master's Fees

■ In addition to identifying general principles that should guide a trial court's decision to appoint a master, this case also requires us to decide when imposition of master's fees on one or both parties is appro-

---

33. *See* Alaska R. Civ. P. 37(a)(4)(A).

34. *Cf.* Alaska R. Civ. P. 37(a) (forcing the losing party to pay fees with respect to a motion to compel, even if filed in good faith).

35. *Van Pilsum v. Iowa State Univ. of Science and Tech.,* 152 F.R.D. 179, 181 (S.D.Iowa 1993) (internal quotation marks omitted). *See also* Jean M. Cary, *Rambo Depositions: Controlling an Ethical Cancer in Civil Litigation,* 25 Hofstra L.Rev. 561, 588–90 (1996) (discussing *Van Pilsum* and the use of Civil Rule 37).

36. *See* Charles Yablon, *Stupid Lawyer Tricks: An Essay on Discovery Abuse,* 96 Colum. L.Rev. 1618, 1642 (1996) (suggesting that courts "[a]ppoint special discovery masters to attend every deposition and glare at the litigators whenever it looks like they are going to get out of line").

37. *See, e.g., AIU Ins. Co. v. Mehaffy,* 942 S.W.2d 796, 799–803 (Tex.App.1997) (holding that trial courts can neither appoint special masters as "auditors" to investigate discovery violations nor force a party to pay for the audit as part of a sanction).

priate. Most courts and commentators that have discussed the issue have concluded that courts should consider the parties' financial means when determining the method of compensating a master. A recently proposed Michigan rule would allow the court to appoint a discovery referee only if it is fair to the litigants based on their conduct and financial means:

> The court may appoint a discovery master if the court finds ... it is fair to impose the cost of a discovery master on the parties, taking into account the nature of the case, the means of the parties, the conduct of the parties that contributes to the need for a master, and the degree to which appointing a discovery master would facilitate a more speedy and economical determination of the case.[38]

Similarly, the California Court of Appeal recently held that trial courts must consider a party's financial condition in determining whether to refer discovery disputes to a master if referral would require imposition of master's fees.[39] One commentator expressed concern that

> [t]he risk of imposing unfair costs on a party is a particular concern in determining whether to appoint a pretrial master.... Parties are not required to defray the costs of providing public judicial officers, and should not lightly be charged

with the costs of providing private judicial officers.[40]

We agree with these jurisdictions; courts should logically consider the possibility of economic hardship on one or more parties when fashioning a plan to compensate a discovery master.

■ Progressive claims that the Peters must make a showing of indigency before the court can consider financial hardship in appointing a master. But in cases involving parties of "modest means," California courts must still determine a "fair and reasonable apportionment of reference costs before issuing [their] order." [41] Indeed, given the fees normally charged by many private referees,[42] even a relatively small number of good-faith disputes could be financially devastating to even a non-indigent party.[43]

More fundamentally, all potential litigants—not just those who are indigent— have a constitutional right in Alaska of meaningful access to the justice system.[44] Prohibitively high master's fees could potentially jeopardize such access. In *Malvo v. J.C. Penney Co.*,[45] we invalidated an attorney's fees award that compensated the defendant for the full amount of his attorney's fees, noting that when a plaintiff risks such a high potential liability, "the size of a party's bank account will have a major impact on his access to the courts." [46] Even if an imposi-

---

**38.** Lawson, *supra* note 24, at 900 n. 254.

**39.** *See Taggares v. Superior Court*, 62 Cal.App.4th 94, 72 Cal.Rptr.2d 387, 393–94 (1998); *McDonald v. Superior Court*, 22 Cal.App.4th 364, 27 Cal.Rptr.2d 310, 314–15 (1994).

**40.** Edward H. Cooper, *Civil Rule 53: An Enabling Act Challenge*, 76 Tex. L.Rev. 1607, 1623 (1998). *See also* Manual for Complex Litigation, Third § 21.52 (3d ed.1995) (noting that courts should consider the "imposition on parties of extra expense").

**41.** *McDonald*, 27 Cal.Rptr.2d at 314–15 (internal quotation marks omitted).

**42.** The proposed master in this case would have been compensated at $190 per hour.

**43.** A trial court has limited discretion in discovery matters to impose a sanction that has the effect of ending the litigation entirely. *See Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1169 (Alaska 1998); *see also* Alaska R. Civ. P. 37(b)(3).

If the master's fees are high enough, and if good-faith disputes are inevitable, such fees could conceivably be so large as to force plaintiffs like the Peters to abandon the litigation or to withhold otherwise legitimate discovery requests on salient issues.

**44.** *See Bush v. Reid*, 516 P.2d 1215, 1218–21 (Alaska 1973). We clarified this right in *In re K.A.H.*, 967 P.2d 91 (Alaska 1998), in which we held that Alaska Rule of Professional Conduct 1.8(e) does not violate the general right of access to civil court merely because it prohibits lawyers from providing clients with financial assistance other than court and litigation costs. *See id.* at 94–95. We found significant that, unlike the law in *Bush* prohibiting parolees from filing suit, Rule 1.8(e) did not "require[ ] plaintiffs to pay for court access." *Id.* at 95.

**45.** 512 P.2d 575 (Alaska 1973).

**46.** *Id.* at 587.

tion of costs or fees is valid on its face, it "may offend due process because it operates to foreclose a particular party's opportunity to be heard." [47] We believe the ultimate test, as Justice Matthews expressed it in his dissent in *Bozarth v. Atlantic Richfield Oil Co.*,[48] is "whether the [cost] is so great that it imposes an intolerable burden on a losing litigant which, in effect, denies the litigant's right of access to the courts." [49]

█ The Peters argue that *any* imposition of master's costs on a financially disadvantaged party violates Civil Rule 26, which allows discovery of all relevant nonprivileged material.[50] They argue that discovery requests by indigent parties are chilled when those parties know they must pay extra fees for discovery requests. But such a result is not a per se violation of the rules; the same argument could be made with equal force against the Rule 37 provision forcing parties to pay fees and costs upon losing a good-faith motion to compel. And if a discovery master is otherwise appropriate, appointment should not be deemed a procedural violation merely because it discourages lengthy discovery requests. If the chill is so severe as to effectively end the litigation or destroy a party's meaningful access to the courts, however, then appointment of a master in such circumstances would most likely be inappropriate.[51]

█ Of course, any added cost to the litigants for paying master's fees may be offset by the time and money saved "in the long run by the more efficient progress of discovery and the elimination of time spent in motions to compel." [52] The implications of these long-term savings extend beyond a particular case:

> The cost of a private referee ... must also be weighed against the ... cost of having to seek repeated judicial intervention through motions and Court appearances to resolve disputes and compel compliance with discovery, and the potential prejudice due to delay of the case.... In addition, there is the hidden cost to all users of the judicial system from the waste of scarce judicial resources and increased calendar congestion.[53]

Thus, to determine whether master's fees in any given case infringe upon the guaranteed

**47.** *Id.* (quoting *Boddie v. Connecticut*, 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)).

**48.** 833 P.2d 2 (Alaska 1992).

**49.** *Id.* at 6 (Matthews, J., dissenting). The *Bozarth* majority recognized that an attorney's fees award of $76,000 was "disturbing" and that such fees might "deter[ ] a broad spectrum of our populace from the voluntary use of our courts." *Id.* at 4 n. 3. But we also decided that, based on the language of Rule 82, we lacked authority to reduce or vacate the award. *See id.*

**50.** *See* Alaska R. Civ. P. 26(b)(1).

**51.** Progressive argues that high masters' fees are not prohibitive because "the vast majority of contingent fee agreements allow (or even require) the attorney to advance costs on behalf of a client of limited means. Upon closure of the case, costs are recouped. Most attorneys are more than happy to advance costs on behalf of their client." But in *Malvo v. J.C. Penney Co.*, 512 P.2d 575 (Alaska 1973), we invalidated an attorney's fee award of $10,500 because such a large fee might discourage suits by low-income plaintiffs who cannot afford to risk such liability in order to litigate their case. *See id.* at 586–87. Given that the proposed master in this case charges an hourly rate of $190, the fees in this case could be similarly prohibitive.

We do agree with the dissent that reference of the cost advancement issue to an advisory committee would be appropriate. *See* Dissent at 876 n. 10. We therefore request that the Rules of Professional Conduct Committee of the Alaska Bar Association make a recommendation to the Board of Governors as to whether attorneys may ethically advance masters' fees to their clients as "costs and expenses" under the recently amended Rule of Professional Conduct 1.8(e)(1). We also request that our Standing Advisory Committee on the Civil Rules of Procedure address whether such fees are recoverable as costs under Civil Rule 79(f).

**52.** *Van Pilsum v. Iowa State Univ. of Science & Tech.*, 152 F.R.D. 179, 181 (S.D.Iowa 1993); *see also Mercer v. Gerry Baby Products Co.*, 160 F.R.D. 576, 577 (S.D.Iowa 1995) ("Although the use of the special master increases transactional costs in the short run, this increase will be minimal compared with the expenses (time, money, and energy) incurred to-date, and should result in savings to each party in the long run."); Jonathan S. Liebowitz, *Special Masters: An Alternative Within the Court System*, 48 Disp. Resol. J., 64, 67 (1993) ("When measured against the prospect of trying the case for years ... the costs of using the services of a special master fade into insignificance.").

**53.** Powers, *supra* note 28, at 101.

right of access to the justice system in Alaska, courts may take into account the possibility that the costs to the litigants are offset by the efficiency of master-assisted litigation.

Although trial courts should not be burdened with performing an elaborate analysis of the total amount of master's fees as a percentage of each party's annual income, courts should not choose a means of compensation without considering whether the parties can reasonably afford the fees and whether potentially viable alternatives exist to the appointment of a private referee. Such alternatives include appointment of masters for a limited purpose or duration or placing a cap, proportionate to a litigant's annual income, on the amount of master's fees imposed on them.[54] To determine whether a party can afford a private referee, trial courts could rely upon financial affidavits similar to those used to determine waiver of filing fees and bonds. In the end, the burden on trial courts from having to consider parties' financial means is minimal compared to the burden on indigent or "modest means" litigants of having to pay prohibitively high masters' fees in order to have their claims adjudicated.

From the point of view of low-income litigants, a "loser pays" system, in which the loser of each discovery dispute pays the master's fees for that dispute, may be preferable to equal distribution of costs. As the dissent points out, the trial court in this case most likely chose the "loser pays" system in an attempt to minimize the financial hardship on the Peters.[55] But the fact that such a system is preferable to equal distribution does not make it fair and reasonable in every case. Depending on the number of likely disputes, the master's hourly rate, the party's annual income, and the available alternatives, a "loser pays" provision may still preclude a financially disadvantaged party from gaining meaningful access to justice.

In short, trial courts have an implied obligation under both the Civil Rules and the Alaska Constitution to consider the parties' financial status before issuing an order of reference and to choose a method of compensation that does not restrict litigants' meaningful access to discovery or, more generally, to the justice system.

### D. *Necessity of a Remand*

The record does not reveal whether the Peters are of sufficiently modest means or whether the discovery master's fees will be sufficiently high as to call into question the Peters' meaningful access to the justice system. For example, it is unclear from the record to what extent any benefit or settlement payments already made by Progressive to the Peters have affected the Peters' ability to pay master's fees.[56] Although the Peters did include financial hardship as an issue in their opposition to Progressive's motion for appointment of a master, it is unclear whether the superior court considered the parties' financial status before issuing the order. Accordingly, we remand to give the court an opportunity to evaluate the Peters' claim of economic hardship and to determine a fair and reasonable means of compensating the discovery master should the court determine that a master is appropriate in this case.[57]

---

**54.** *See, e.g., Bozarth v. Atlantic Richfield Oil Co.,* 833 P.2d 2, 6 (Alaska 1992) (Matthews, J., dissenting) (suggesting a cap on attorney's fee awards proportionate to plaintiff's annual income). Courts generally may not force the nonindigent party to pay the full cost of the referee's fees merely because of the other party's indigence. *See, e.g., Taggares v. Superior Court,* 62 Cal.App.4th 94, 72 Cal.Rptr.2d 387, 394 (1998).

**55.** *See* Dissent at 875.

**56.** Progressive claims to have paid more than $70,000 in medical payments and third-party liability payments to the Peters thus far.

**57.** The Peters also advance equal protection and due process claims. But these claims stand or fall on whether appointment of a master precludes the Peters' meaningful access to the courts or works as a de facto sanction. To the extent that the Peters make a generic argument that the "appointment creates an advantage of the rich over the poor," the same argument could be made against nearly every pre- or posttrial imposition of costs on parties. The crucial inquiry is whether such costs affect other substantive rights or are otherwise violative of the Civil Rules.

Judge Brown arguably could have viewed the debate regarding Progressive's motion for a protective order, during which the Peters filed an opposition with over one hundred pages of exhibits, as a harbinger of future contentiousness between the parties. Indeed, such a prediction is borne out by the vast number of *post*-appointment discovery requests submitted by the Peters.[58] Thus, we cannot say that the trial judge abused his discretion in appointing a master given the circumstances of this case. But because we have not previously articulated factors for trial courts· to consider when appointing a discovery master, and because a remand is necessary in any event to resolve the Peters' claim of financial hardship, we believe the superior court should have an opportunity on remand to review its referral order in light of the basic principles we have articulated to determine whether a master is appropriate in this case. In doing so, the superior court may find it necessary to review the entire course of discovery, including post-appointment requests.

## V. CONCLUSION

By articulating guidelines for courts to consider when appointing discovery masters, we do not wish to discourage use of such masters. Rather, we hope to ensure both that trial courts have the time and resources they need to adjudicate disputes while still protecting the ability of persons of modest means to gain access to the judicial system. Because we have not previously set forth these factors, we VACATE the superior court's order of reference and REMAND to give the court an opportunity to consider the factors we have suggested. On remand, the superior court should also determine a fair and reasonable compensation method after considering the impact of master's fees on the parties' meaningful access to the courts.

CARPENETI, Justice, dissenting.

This court has previously held,[1] and repeats today,[2] that the appointment of a discovery master is left to the sound discretion of the trial court. The trial court in this case, accurately anticipating that the discovery disputes would quickly degenerate into near-chaos,[3] appointed a discovery master. In a clear attempt to meet any concern that an individual litigant suing a large company might be disadvantaged by the order of appointment, the trial court provided that the master's fees for any particular dispute would be borne by the party losing the dispute. I would leave undisturbed the trial court's management of ·this case.

The court justifies its interlocutory intrusion into this case by referring to "our judicial duty to determine whether appointment of a master was appropriate in this case."[4] With respect, I disagree: our inquiry is limited to whether the trial court abused its discretion in appointing a master. And the court's justification for acting now—the need for "timely" resolution of this issue given that the trial court stayed all discovery pending the outcome of this petition[5]—must seem ironic indeed to litigants whose case has been

---

**58.** The Peters submitted more lengthy discovery requests after the court's appointment of a master in April 1998. In May and June 1998 the Peters filed 125 requests for admission and 238 requests for production with Progressive. And in August 1998, in responding to one of Progres-. sive's motions for a protective order, the Peters filed an opposition that was 71 pages long and contained over 1,500 pages of exhibits.

**1.** *See Dean v. Firor,* 681 P.2d 321, 327 n. 8 (Alaska 1984).

**2.** *See* Op. at 867–868.

**3.** Progressive, alleging that the Peters' initial twelve interrogatories (which Progressive has termed "extremely broad, unduly burdensome, and, as a practical matter, virtually impossible to respond to") called for proprietary documents, moved for a protective order precluding the Peters from "disclosing to third parties any confidential or proprietary information produced" in discovery. In response to this motion, the Peters filed a 41–page brief and 138 pages of exhibits. The trial court appointed a discovery master soon afterwards.

Shortly after appointment of the discovery master, plaintiffs within a ten-day period filed a total of 125 requests for admission and 238 requests for production.

**4.** Op. at 868.

**5.** *See* Op. at 868 n. 9.

stayed *because* review was granted.[6] There is no need for action by this court now except that need occasioned by the improvident grant of the petition for review.

That is not to say that Rule 53 might not appropriately be amended, nor that such amendment might not include several of the provisions the court adopts today. But it strikes me that these issues are particularly apt for prior consideration by this court's Civil Rules Advisory Committee, input from the bar, and final determination by this court in its rulemaking function.

Such an approach would have the advantage of informing more fully this court's analysis in an area of today's opinion which I regard as potentially problematic. That is, in determining "whether master's fees in any given case infringe upon the guaranteed right of access to the justice system," trial courts are told only that they "may take into account the possibility that the costs to the litigants are offset by the efficiency of master-assisted litigation."[7] This is problematic for several reasons.

First, the "costs to the litigants"—that is, the master's fees—will be entirely unknown at the beginning of the case. That amount will be a function of several factors truly unknowable to the trial court from its pre-litigation perspective: the amount of contentiousness to come, the future willingness of opposing counsel to try to work within the spirit of the rules, the complexity of legal issues which arise in the course of discovery, and the like.

Second, whether those costs will be "offset by the efficiency of master-assisted litigation" is likewise extremely difficult to assess. If by "the efficiency of master-assisted litigation" the court means, for example, savings to the parties in lower attorney's fees resulting from quicker discovery decisions, how can the trial judge even remotely quantify those calculations?

Third, the court refers to "potentially viable alternatives" to the appointment of a master,[8] but they are not true alternatives. Instead, in suggesting that the trial court might limit the purpose or duration of the appointment or the amount of money to be spent on it, the court merely posits limiting the appointment in various ways. Trial courts presently have that authority and presumably exercise it.

Last, and most importantly, I do not know that the court's assumption that the expense of the discovery master would or should be borne by the parties—as opposed to counsel—is necessarily correct. In the great majority of instances, the client does not participate actively in the formulation and execution of discovery strategy. Because counsel make the decisions which lead to increased expenses, it appears neither unfair nor punitive to require counsel to bear those expenses. The assumption that the master's costs would be borne by the parties rather than counsel—an assumption almost completely unexamined by the court today[9]—should be referred to the Civil Rules Advisory Committee. Reference would allow a full airing of the relevant facts and an examination of the assumptions underlying the various positions which have been presented to the court.[10]

---

6. This court granted the petition for review on May 22, 1998. The trial court stayed all discovery on September 11, 1998.

7. Op. at 874.

8. *Id.* at 874.

9. The court acknowledges Progressive's argument concerning master's fees being paid by counsel, *see* Op. at 873–874 n. 51, citing *Malvo v. J.C. Penney Co.,* 512 P.2d 575 (Alaska 1973), but then assumes that master's fees would be treated the same as attorney's fees. I believe that the assumption is unwarranted. The court cites *Malvo* to support the argument that a high award might discourage lawsuits by low income plaintiffs. But *Malvo* concerned *attorney's* fee awards. Progressive's argument was that *master's* fees have come to be treated generally as an item of expense advanced by counsel for plaintiff and only recovered by counsel from plaintiff if plaintiff prevails. An opponent's attorney's fees are not treated in this fashion. Accordingly, an attorney's fee award could well have a chilling effect, but a master's fee award, if it is in fact treated as an item which is advanced by counsel (and is *not* recovered by the opponent as a cost), would not have a chilling effect.

10. The Rules of Professional Conduct were amended in 1993 to provide that counsel may advance court costs and expenses of litigation, "the repayment of which may be contingent upon the outcome of the matter." Alaska R.

The court acknowledges, at the end of a long and scholarly opinion, that "we cannot say that the trial judge abused his discretion in appointing a master given the circumstances of this case."[11]  I agree.  That is why the petition should be dismissed as improvidently granted.[12]  Because I believe the standards for appointment of masters under Civil Rule 53 and the conditions of appointment can more properly be developed through amendment of the rule, I would refer these issues to the court's standing Civil Rules Advisory Committee for action.

Prof. Conduct 1.8(e)(1) (as amended by Alaska Supreme Court Order No. 1123 (July 15, 1993)).  Reference of this issue to the appropriate advisory committee would allow consideration of whether discovery master expenses should be considered as "costs and expenses" subject to this rule.  Reference would also allow exploration of whether the rules on cost recovery should be amended to allow inclusion of discovery master costs.  *See* Alaska R. Civ. P. 79.

**11.**  Op. at 875.

**12.**  The argument that "a remand is necessary in any event to resolve the Peters' claim of financial hardship," Op. at 875, gives more credit to the claim than it is due:  Both before the superior court and before this court the claim was nothing more than unsupported assertions in briefs.  This court has consistently found unsupported assertions of counsel to be insufficient to raise factual issues.  *See, e.g., French v. Jadon, Inc.,* 911 P.2d 20, 26 (Alaska 1996)("Mere assertions of fact in pleadings and memoranda are insufficient for denial of a motion for summary judgment.") (quoting *State, Dep't of Highways v. Green,* 586 P.2d 595, 606 n. 32 (Alaska 1978)).