H. Thompson PRENTZEL, III, Appellant,

v.

STATE of Alaska, DEPARTMENT OF PUBLIC SAFETY, Trooper Daniel Scott, Trooper Dane Gilmore, Sergeant John Papasodora, Captain Warren Tanner, and Colonel Glenn Godfrey, Appellees.

No. S–12031.

Supreme Court of Alaska.

Sept. 14, 2007.

Rehearing Denied Nov. 8, 2007.

H. Thompson Prentzel, III, pro se, Fairbanks.

Venable Vermont, Jr., Anchorage, and Mary Ann Lundquist, Fairbanks, Assistant Attorneys General, and David W. Márquez, Attorney General, Juneau, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

In 1998 Alaska State Troopers arrested H. Thompson Prentzel, III, without a warrant, for violating conditions of release imposed under a DWI charge. The troopers relied on

the Alaska Public Safety Information Network (APSIN) and records from the Fairbanks Correctional Center (FCC) in determining that he was subject to conditions. There were two problems with this arrest. First, it was not authorized by the warrantless arrest statute, AS 12.25.030, which allowed arrests for violations of conditions of release for some charges, but not a charge of DWI. In addition, violation of conditions of release was not yet specifically defined as a criminal offense; the legislature first made it a crime when AS 11.56.757 went into effect in 2000. Second, Prentzel was not even subject to conditions of release at the time of the arrest—he had pled no contest four days earlier. These APSIN and FCC records had not been promptly updated with Prentzel's judgment. Prentzel sued the State of Alaska, the arresting troopers, and supervising Alaska State Troopers, asserting state-law tort claims and violations of his civil rights under 42 U.S.C. § 1983. In January 2005, Superior Court Judge Mark I. Wood granted summary judgment to the state. Prentzel appeals. We affirm in all respects but one, reversing a portion of the attorney's fees awarded against Prentzel.

## II. FACTS AND PROCEEDINGS

### A. Facts

Many of the relevant facts have previously been set forth in *Prentzel v. State, Department of Public Safety (Prentzel I )*.[1] In October 1998 Alaska State Troopers Daniel Scott and Dane Gilmore were dispatched to the Blue Marlin Bar in Fairbanks in response to a reported disturbance. Near the bar the troopers saw Prentzel with a bottle of liquor; Prentzel appeared to have been drinking. The troopers learned Prentzel's identity and called their dispatcher, who informed them that Prentzel was currently on bail release conditions for a recent charge of driving while intoxicated (DWI) and that his

conditions precluded him from possessing alcohol. The dispatcher's information came from the computerized records in the Alaska Public Safety Information Network (APSIN).

Troopers Scott and Gilmore asked the dispatcher to confirm this information by checking with the Fairbanks Correctional Center (FCC). FCC confirmed the bail release conditions of no consumption and no possession of alcohol. The troopers then asked the dispatcher for a consultation with Alaska State Trooper Sergeant John Papasodora. Sergeant Papasodora reviewed the APSIN records, noted the FCC's confirmation of those records, and directed them to arrest Prentzel for violating conditions of release.

As it turned out, Prentzel was no longer under conditions of release because four days before the arrest he had pled no contest to the DWI charge. The judgment was not distributed by the court until six days after his arrest by Troopers Scott and Gilmore.

In October 1999 Prentzel filed a civil action against the Alaska Department of Public Safety, Troopers Scott and Gilmore, Captain Warren Tanner, and Colonel Glenn Godfrey[2] alleging false arrest, false imprisonment, trespass to chattels, conversion, and negligence.[3] The state defendants denied the allegations and the state filed an Alaska Civil Rule 12(c) motion for judgment on the pleadings. Prentzel moved to amend his complaint to claim civil rights violations under 42 U.S.C. § 1983, attorney's fees under 42 U.S.C. § 1988, and civil rights violations under the Alaska Constitution. Prentzel later moved for permission to file a second amended complaint to add claims against an unknown Sergeant John Doe, and to allege that the defendants' actions were willful and malicious. Soon after, the superior court granted the state defendants' motion to dismiss the amended complaint and ruled that the second amended complaint would not change the outcome of its ruling.

1. *Prentzel v. State, Dep't of Pub. Safety,* 53 P.3d 587 (Alaska 2002) (*Prentzel I* ).

2. Colonel Glenn Godfrey is deceased.

3. Prentzel's complaint stated that as a result of the arrest, he was:

humiliatingly handcuffed in public for more than 10 min.; detained in an unsanitary cell without sink or toilet for more than 12 hours; manhandled by officers who falsely charged [him] with resisting arrest ... [and] drug possession, [had] the humiliation of having these false charges ... printed in the local newspaper ... all resulting in increased stress.

Prentzel appealed. We reversed the dismissal of Prentzel's negligence claims against the state defendants and his § 1983 claim against Troopers Scott and Gilmore, Captain Tanner, and Colonel Godfrey.[4] We ruled that Prentzel's claims against Troopers Gilmore and Scott were improperly dismissed on the ground of official immunity because the troopers would only be entitled to qualified immunity.[5] We noted that Prentzel had responded to the qualified immunity defense by alleging that the troopers acted with malice—a factual question not suitable for disposition on the pleadings. We also held that Prentzel's negligence claims against the troopers and Captain Tanner and Colonel Godfrey were improperly dismissed because the pleadings did not rule out the possibility of actionable claims for negligent training and supervision.[6] We further held that any defect in Prentzel's pleadings did not require dismissal of the § 1983 claims against the individually named officers and troopers.[7] Last, we affirmed the dismissal of Prentzel's claim based on alleged violations of the Alaska Constitution because the issue was inadequately briefed.[8]

## B. Proceedings After Remand

Following remand, trial was scheduled for the week of December 1, 2003. In a pretrial order dated November 25, 2002, the superior court ordered that motions to amend the pleadings were due by February 24, 2003 and dispositive motions were due by August 1, 2003. In November 2003 Prentzel moved for a continuance of trial because he did not have sufficient funds to conduct discovery. The superior court granted the motion and continued the trial to the week of September 13, 2004. On November 25, 2003, the superior court informed Prentzel on the record that no further amendments to the pleadings were authorized and dispositive motions were due by July 2, 2004; a pretrial order dated December 16, 2003, confirmed these deadlines.

In spite of the court's pretrial order, Prentzel moved to amend his complaint in June 2004. He sought to name Sergeant John Papasodora in place of Sergeant John Doe and attempted to clarify that he was suing the troopers in their individual capacities for money damages. In addition, Prentzel proposed to add a claim that the "Alaska State Troopers are deliberately indifferent to the inevitable false arrest of persons whose bail has been exonerated for violation of bail conditions of release." The court granted Prentzel's motion, and the state answered the third amended complaint on August 19, 2004.

Meanwhile, the state had filed a motion for summary judgment on July 2, 2004, the deadline for filing dispositive motions. On August 5 Prentzel indicated that he was not prepared for trial and requested another continuance. The superior court granted the request and set the trial for the week of January 17, 2005.

The court further specified that amendments to the pleadings were due by September 20, 2004, and dispositive motions were due by October 4, 2004. The court also gave Prentzel until September 24, 2004, to file his opposition to the state's summary judgment motion.

Prentzel failed to respond to the summary judgment motion and filed no other pleadings by these newly extended deadlines. He also failed to appear on November 9, 2004, for oral argument on the summary judgment motion.

The next day, the superior court issued a notice of intent to grant the troopers' motion for summary judgment unless Prentzel filed a "responsive pleading" by November 24, 2004. On November 23, 2004, Prentzel filed a motion for summary judgment; a motion for extensions of time to oppose the defendants' motion for summary judgment and to file his own motion for summary judgment; a motion for a permanent injunction; and a motion to file a fourth amended complaint to

---

**4.** *Prentzel I,* 53 P.3d at 596.

**5.** *Id.* at 591.

**6.** *Id.* at 592.

**7.** *Id.* at 595–96.

**8.** *Id.* at 596.

include a contingent cause of action based on an alleged violation of the Alaska Constitution that he could pursue if his other causes of action were dismissed.

The state moved to dismiss Prentzel's complaint and to strike his November 23 motions. It argued that Prentzel's pleadings contained "nothing that amounts to a response or opposition to the defendants' motion for summary judgment." It further contended that many of Prentzel's requests were simply untimely and without good cause. Prentzel opposed the state's motion, countering that his motions were " 'responsive pleadings' within the intention, if not the letter, of the [c]ourt's November 12, 2004 Order."

### C. The Superior Court's Orders

#### 1. Order granting summary judgment to the state defendants

The superior court granted summary judgment in favor of the state defendants. The court first determined that the state, Troopers Scott and Gilmore, Captain Tanner, and Colonel Godfrey were immune in their official capacities from false-arrest and false-imprisonment claims. The court relied on AS 09.50.250(1) in determining that the individually named defendants were "statutorily immune in their official capacities from claims based on the exercise or performance of a discretionary function or duty, regardless of whether they abused their discretion." [9]

The court also ruled that Troopers Scott and Gilmore were immune from suit even though they admittedly misunderstood the law by failing to recognize that AS 12.25.030 did not authorize warrantless arrests for violations of misdemeanor DWI bail conditions. It reasoned that Troopers Scott and Gilmore were "entitled to qualified immunity unless their actions were corrupt, malicious or oth-

erwise taken in bad faith." The court reviewed the affidavits of Prentzel, Troopers Scott and Gilmore, Sergeant Papasodora, and Captain Tanner to determine if any evidence suggesting malice in the arrest of Prentzel had been presented. It found no evidence of malice.

The court next determined whether Troopers Scott and Gilmore were entitled to official immunity from Prentzel's § 1983 claims, using the framework for official immunity we set out in *Prentzel I*.[10] The court looked at the troopers' affidavits: the troopers believed that Prentzel was violating the law in their presence; they consulted with APSIN and the FCC records, which confirmed that Prentzel was committing an offense they believed to be subject to a warrantless arrest; they checked with their sergeant who directed them to arrest Prentzel; and they knew of no unlawful customs or policies directed against Prentzel. The court concluded that it was "apparent that a reasonable officer in the same circumstances would have concluded that it was proper to arrest Prentzel," so Troopers Scott and Gilmore were entitled to official immunity protection from the § 1983 claims.

The court similarly concluded that Colonel Godfrey and Captain Tanner were entitled to official immunity on the § 1983 claim. The court observed that because supervision and training of troopers are official conduct of supervising officers, this conduct was covered by immunity under AS 09.50.250(1). In addition, the court stated that Captain Tanner and Colonel Godfrey were immune from the claims of negligent supervision and training because they could not be held liable for immune conduct of other troopers. The court also noted that even without official immunity, the state and the individual defendants would not be liable, because "[t]he State does not owe a duty of care to proceed

---

9. AS 09.50.250(1) provides in relevant part:
 [A]n action may not be brought [against the state under this section] if the claim
 (1) . . . is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused[.]

10. In *Prentzel I*, we noted that
 > Troopers Scott and Gilmore are entitled to protection from the § 1983 claim on official immunity grounds if they can establish that a reasonable officer could have believed that their conduct was lawful, even if it actually was not.
 *Prentzel I*, 53 P.3d at 595 n. 40.

without error in bringing legal action against a citizen."

Finally, the court determined that Captain Tanner and Colonel Godfrey were entitled to official immunity from Prentzel's § 1983 claim alleging that, while acting outside of their official capacities, they had adopted customs and policies directed at violating Prentzel's civil rights.

### 2. Order regarding miscellaneous motions

In a separate "Order Regarding Miscellaneous Motions," the superior court clarified some of the reasoning behind its order granting summary judgment; it also ruled on Prentzel's recent motions. The court stated that it treated Prentzel's November 23, 2004 motion for summary judgment as his opposition to the state's motion for summary judgment. It struck as untimely Prentzel's motion to amend his complaint; it also struck as untimely his motion for summary judgment but specified that this ruling applied only to the extent that the motion was unresponsive to the state's summary judgment motion and raised new matters beyond the third amended complaint.

The court supported this decision by listing the many continuances Prentzel received and the numerous filing deadlines he missed:

> While the court has considered Prentzel's Motion for Summary Judgment as a responsive pleading in opposition to the State's motion, [it] will not allow a dispositive motion on the eve of trial where three deadlines [had] been ignored by Prentzel, nor will [it] allow a motion to amend the complaint filed on the eve of trial that raises new issues requiring additional discovery and the continuance yet again of this trial.

The court further explained that it had "given Prentzel every opportunity to litigate his claims. But the rules have been relaxed long enough." While acknowledging that striking the late-filed pleadings was indeed a

sanction, the court emphasized that it was not a litigation-ending sanction. Rather, in the court's view the litigation ended because of the court's order granting the state's summary judgment motion "on its merit."

The court later found that the state was the prevailing party and awarded attorney's fees totaling $13,662.02 under Civil Rules 68 and 82.

The court then issued an "Amended Final Judgment." The judgment listed each defendant by name and declared that judgment was entered in the defendant's favor. The listed defendants included Sergeant Papasodora, who had not been expressly granted immunity in the superior court's order granting summary judgment to the state defendants.

Prentzel appeals.

## III. DISCUSSION

### A. The State's Motion for Summary Judgment

#### 1. Proper standard for deciding motion for summary judgment

■■■ We independently review an order granting summary judgment, "determining whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law." [11] We consider the "entire record in the light most favorable to the non-moving party." [12] We have held:

> The moving party has the "entire burden" of proving that it is entitled to summary judgment. That is, unless the moving party points to undisputed facts or admissible evidence establishing a prima facie case entitling it to summary judgment as a matter of law, the opposing party has no obligation to produce evidence supporting its own position.[13]

■■■ Prentzel argues that the superior court applied an improper standard when considering the state's motion for summary

11. *In re Estate of Maldonado*, 117 P.3d 720, 722 (Alaska 2005).

12. *Olson v. Teck Cominco Alaska, Inc.*, 144 P.3d 459, 463 (Alaska 2006).

13. *B.R. v. State, Dep't of Corr.*, 144 P.3d 431, 433 (Alaska 2006) (citing *Barry v. Univ. of Alaska*, 85 P.3d 1022, 1025–26 (Alaska 2004)).

judgment because it failed to look at all of the arguments in his motion for summary judgment. But the trial court is not bound by the formal issues framed in the pleadings when deciding a motion for summary judgment under Rule 56; instead, as we explained in *Jennings v. State,*

> the court must consider the issues presented by the other material offered by the parties on the motion to determine whether the Rule 56 request should be granted. Thus the court will examine the pleadings to ascertain what issues of fact they present and then consider the affidavits, depositions, admissions, answers to interrogatories and similar material to determine whether any of these issues are real and genuine and whether any of the post-pleading material suggests the existence of any other triable genuine issues of material fact.[14]

Prentzel claims that the superior court abused its discretion under *Jennings* because it failed to consider two of his arguments: that the supervising officers violated § 1983 by being "deliberately indifferent to the rights of persons recently exonerated from bail conditions to be free from wrongful arrest"; and that the state failed to "inform state troopers of the temporal gap that existed between actual court dispositions of criminal cases and the information contained in the APSIN computer database and FCC records."

■ But while the superior court did not explicitly address these arguments, it had no duty to fully explain its summary judgment decision. Because summary judgment rulings resolve pure questions of law and are subject to independent review based on the entire trial court record, the Alaska Rules of Civil Procedure do not require rulings on motions for summary judgment to include

findings of fact or conclusions of law.[15] Here, we find no indication that the superior court failed to fulfill its duty to go "outside the pleadings to consider the entire setting of the case to the extent that the material was brought to the court's attention by the parties on the motion."[16] Moreover, the court stated that it considered Prentzel's motion for summary judgment as an opposition to the state's motion to the extent that it was responsive; it also referred to Prentzel's affidavit and memorandum of law in its order granting summary judgment.

The court further made it clear that it would not permit Prentzel to raise new issues on the eve of trial that might require more delay. Prentzel's untimely motion for summary judgment and fourth amended complaint were the first pleadings in which he asserted a claim that the state failed to adequately train and warn officers about delays in entering information on APSIN and at FCC. In support of this new allegation, he submitted copies of notices of dismissal from his own various arrests as well as deposition testimony of the troopers. Because this new evidence was untimely and could easily have resulted in delaying discovery and trial, the court could justifiably have declined to consider it in ruling on the pending summary judgment issues.

### 2. Claims against Troopers Scott and Gilmore and Sergeant Papasodora

#### a. False arrest/false imprisonment and trespass to chattels claims

■ Prentzel argues that the superior court should have granted summary judgment to him on his claims of false arrest[17] and trespass to chattels against his arresting officers—Troopers Daniel Scott and Dane Gilmore and Sergeant John Papasodora. A

---

14. *Jennings v. State,* 566 P.2d 1304, 1310 (Alaska 1977) (quoting 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE. CIVIL § 2721, at 475–76 (1973)).

15. *See* Alaska R. Civ. P. 52(a) ("Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56. . . .").

16. *Jennings,* 566 P.2d at 1310.

17. We refer to Prentzel's claim as a "false arrest" claim because "[f]alse arrest and false imprisonment are not separate torts. A false arrest is one way to commit false imprisonment; since an arrest involves restraint, it always involves imprisonment." *Waskey v. Municipality of Anchorage,* 909 P.2d 342, 345 (Alaska 1996) (quoting *City of Nome v. Ailak,* 570 P.2d 162, 168 (Alaska 1977)) (internal quotation marks omitted).

claim of false arrest is established by showing a restraint upon the plaintiff's freedom without proper legal authority.[18] Prentzel insists that this claim has been established; he points out that the troopers arrested him without a warrant and claims that they lacked authority to make the arrest because a warrantless arrest was not authorized by statute and his conduct did not amount to a crime. Trespass to chattels is a lesser form of conversion: it "can be committed when a party intentionally dispossesses another of the chattel or intentionally uses or interferes with a chattel in another's possession."[19] Prentzel argues that because the arrest was unlawful, seizing his property incident to the arrest necessarily violated the law and resulted in a tortious deprivation of his property.

The state responds that the troopers are entitled to qualified immunity "because governmental immunity applies to situations where state officials misinterpret the law and because the record demonstrated that the troopers 'acted reasonably without malice.'" The state points to the three-step immunity analysis set out in *Aspen Exploration Corp. v. Sheffield,*[20] which the superior court applied on remand following *Prentzel I.*

█ As we later summarized it in *Alpine Industries, Inc. v. Feyk,*[21] the *Aspen* test for official immunity from a state-law tort claim asks three questions:

> First, does the doctrine of official immunity apply to the state official's conduct? Second, if it does apply, is the immunity absolute or qualified? And third, if it is only a qualified immunity, did the state official act corruptly, maliciously, or in bad faith? [22]

Below, we consider each of these questions as they apply to Prentzel's case.

### (1) Does the doctrine of official immunity apply to the troopers' conduct?

█ In answering the *Aspen* test's first question, we stated in *Alpine Industries* that "official immunity applies to an official's conduct if (1) it is within the scope of the official's authority, and (2) it is a discretionary act."[23] Prentzel argues that these requirements are absent here because his arrest was for a "nonexistent offense"; he reasons that his arrest thus exceeded the troopers' authority and that the troopers could not have had any discretion to decide that probable cause existed for non-existing crimes.

█ The state responds that making an arrest is within the scope of a trooper's authority, even if that authority is abused—because "an abuse of authority is not synonymous with a lack of authority."[24] The state points to *Aspen,* where the governor was alleged to have made defamatory statements in connection with a matter of public debate.[25] We stated that the "critical inquiry is not whether the governor is authorized to make defamatory remarks, but whether he has the authority to engage in the underlying conduct out of which the alleged defamation arises."[26] We held that it was certainly within the governor's scope of authority to make statements on matters of public interest.[27] The state argues, similarly, that making arrests is certainly within the scope of authority of the state troopers. The state relies on AS 18.65.080, which provides that a peace officer may "make an arrest without a warrant for a violation of law committed in the[ir] presence."[28] Likewise, seizing contraband or other items found on an arrestee

18. *Id.*

19. *K & K Recycling, Inc. v. Alaska Gold Co.,* 80 P.3d 702, 717 & n. 26 (Alaska 2003) (citing Restatement (Second) of Torts § 217 (1965)).

20. *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150 (Alaska 1987).

21. *Alpine Indus., Inc. v. Feyk,* 22 P.3d 445 (Alaska 2001).

22. *Id.* at 447–48 (citations omitted).

23. *Id.* at 448.

24. *Aspen,* 739 P.2d at 155 n. 11.

25. *Id.* at 155.

26. *Id.*

27. *Id.*

28. AS 18.65.080.

falls within the scope of an officer's authority when making an arrest: "Search [and seizure] incident to lawful arrest allows the warrantless search of the area 'within [the arrestee's] immediate control' at the time of the arrest to ensure officer safety and to preserve evidence related to the crime." [29]

We agree that making arrests and seizing property incident to arrests is conduct that falls within the troopers' usual authority. The legislature had already determined before Prentzel's arrest that officers could make warrantless arrests for certain violations of conditions of release. The relevant parts of AS 12.25.030 provided that:

> (b) In addition to the authority granted by (a) of this section, a peace officer
>
> . . . .
>
> . (2) without a warrant may arrest a person if the officer has probable cause to believe the person has, either in or outside the presence of the officer,
>
> . . . .
>
> (C) violated a condition of release imposed under AS 12.30.025 [30] or 12.30.027; [31]
>
> (3) without a warrant may arrest a person when the peace officer has reasonable cause for believing that the person has
>
> (A) committed a crime under or violated conditions imposed as part of the person's release before trial on misdemeanor charges brought under AS 11.41.270[.] [32]

The troopers' decision to arrest Prentzel thus demonstrated their misunderstanding of the specific conduct the legislature had included in AS 12.25.030. The troopers all testified that they simply believed that Prentzel was violating the law. We noted in *Aspen* that

> to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity

defense. Once tortious acts are excluded from an exercise of authority, only innocuous activity remains to which immunity would be available. Thus, the defense would apply only to conduct for which it would not be needed. [33]

In other words, if immunity only applied to the troopers' conduct when they correctly interpreted the law of arrest, the immunity defense would never be needed.

### (2) Does absolute or qualified immunity apply to the troopers' conduct?

The second question of the *Aspen* test asks whether the immunity should be absolute or qualified. [34] The state argues that the troopers are entitled to qualified immunity.

■ To determine whether immunity is absolute or qualified we must balance three factors:

(1) The nature and importance of the function that the officer performed to the administration of government (i.e. the importance to the public that this function be performed; that it be performed correctly; that it be performed according to the best judgment of the officer unimpaired by extraneous matters);

(2) The likelihood that the officer will be subjected to frequent accusations of wrongful motives and how easily the officer can defend against these allegations; and

(3) The availability to the injured party of other remedies or other forms of relief (i.e. whether the injured party can obtain some other kind of judicial review of the correctness or validity of the officer's action). [35]

■ On balance, we agree that qualified immunity rather than absolute immunity should apply to the conduct at issue here—

---

**29.** *Crawford v. State,* 138 P.3d 254, 258 (Alaska 2006) (quoting *McCoy v. State,* 491 P.2d 127, 133 (Alaska 1971)) (second alteration in original).

**30.** AS 12.30.025 (release before trial in cases involving stalking).

**31.** AS 12.30.027 (release in domestic violence cases).

**32.** AS 11.41.270 (stalking in the second degree).

**33.** *Aspen,* 739 P.2d at 154.

**34.** *Id.* at 159.

**35.** *Id.* at 159–60.

the discretionary act of making arrests and seizing contraband in the course of arrest.[36]

First, as the superior court put it, it is of great societal importance that officers be "able to perform their investigatory and law enforcement duties, without fear of retribution for mistakes made in good faith." Second, without immunity, arresting officers could be "subject to frequent accusations of wrongful motives when performing their law enforcement duties." And third, under qualified immunity relief would be available to Prentzel if he could show that the troopers acted corruptly, maliciously, or in bad faith.

### (3) Did the troopers act corruptly, maliciously, or in bad faith?

■ Prentzel argues that the troopers are not entitled to immunity, because their conduct was malicious. He rests this claim on his subjective belief that the troopers enjoyed arresting him:

> Upon information and belief, Scott and Gilmore were enjoying arresting me. When I was informed by my criminal attorney that I was arrested for a nonexistent offense, this sealed my impression that I was arrested maliciously by these police officers who couldn't find a lawful basis to arrest me so they just manufactured one. I believe that this is ample evidence of malice and that a jury should be permitted to hear it.

Prentzel also claimed in an unsworn statement that Trooper Scott used a gleeful tone of voice when deciding to transport Prentzel to jail.

Prentzel's conclusory statements describing his subjective impressions do not raise disputed questions of material fact.[37] After we remanded his case in *Prentzel I*,[38] Prentzel had the opportunity to depose Troopers Scott and Gilmore and to collect other evidence bolstering his personal impression of the troopers' alleged malice. As the superior court correctly observed, despite this opportunity Prentzel made only "vague conclusory allegations of malice."

■■ In his briefing, Prentzel observes that "malice is a question of fact inappropriate for resolution on a motion for summary judgment." But this observation misses a crucial point: before malice can become a disputed question of fact, the record must contain at least some objective evidence establishing facts capable of supporting an inference of malice. The need for a non-conclusory factual basis is especially important when, as here, the ultimate question involves immunity; as we have emphasized on other occasions, official immunity shields government officials "not just from liability, but from *suit*."[39] Indeed, we have stressed that "although the existence or absence of malice is generally a question of fact for the jury, when this question has been removed from the case by uncontroverted affidavits and/or depositions, summary judgment may be granted."[40]

There is ample record evidence that the troopers acted without malice, and, in fact, did everything they could to ensure that Prentzel's arrest was appropriate. The troopers relied on APSIN and FCC information about Prentzel being on conditions of release before arresting him; they believed Prentzel was violating the law in their presence; they consulted with Sergeant Papasodora before arresting him; they had not heard of Prentzel except for the DWI arrest by Trooper Scott two weeks before; they were unaware of any of his other past arrests; and they had never heard of any

---

**36.** Cf. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity.") (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

**37.** See *Keen v. Ruddy*, 784 P.2d 653, 656 (Alaska 1989) ("The Keens' vague allegations of malice are insufficient, absent some showing of specific facts, to preclude summary judgment.").

**38.** *Prentzel I*, 53 P.3d at 591.

**39.** See *Karen L. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 953 P.2d 871, 879 (Alaska 1998) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (emphasis in original).

**40.** *Aspen*, 739 P.2d at 160 n. 24.

Alaska State Trooper policy aimed at violating Prentzel's rights. Because Prentzel's subjective conclusion that the troopers enjoyed arresting him finds no objective support from the facts in the record, it fails to raise a genuine issue of material fact disputing the strong evidence tending to show that the troopers acted without malice.

In light of the three-factor *Aspen* analysis, we affirm the superior court's summary judgment order adopting qualified immunity as a ground for dismissing Prentzel's state-law tort claims against the troopers.

### b. Section 1983 claim against the arresting troopers

Prentzel argues that the superior court erred in not awarding him summary judgment on his cause of action alleging that Troopers Scott and Gilmore and Sergeant Papasodora violated 42 U.S.C. § 1983.[41] He claims that the troopers violated his civil rights when, acting under color of state law, they violated his Fourth Amendment rights by subjecting him to a warrantless arrest without probable cause and seizing his property incident to the arrest.

■■ To sustain an action under § 1983, Prentzel must show: "(1) that the conduct complained of was committed by a person acting under color of state law and (2) that the conduct deprived [him] of a [federal] constitutional right."[42] Prentzel argues that he made out a prima facie case under § 1983 by showing that the officers acted under color of state law and deprived him of his Fourth Amendment right to be free from unreasonable searches and seizures by arresting him and seizing his property without probable cause, without a warrant, and without any circumstances creating an exception to the warrant requirement. Prentzel further argues that the officers are not entitled to qualified immunity under the standards governing § 1983 claims. He contends that, because Alaska law did not authorize his arrest, the arrest was a per se violation of his Fourth Amendment rights. We disagree.

■■■ Under federal law governing constitutional claims brought under § 1983, "a law enforcement officer is entitled to qualified immunity if, in light of clearly established law and the information available to the officer at the time, a reasonable officer could have believed the arrest was lawful."[43] "The law is 'clearly established' if the contours of the right are sufficiently clear that a reasonable official would understand that his actions violate that right."[44] The United States Supreme Court has held that officers must be granted immunity under this standard when they are reasonably mistaken as to the legality of their actions.[45] In other words, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[46]

---

41. We note that the superior court's order granting summary judgment does not mention · Sergeant Papasodora—he is not identified as a defendant in the text and does not appear in the caption. This was apparently an oversight. On July 2, 2004, the state filed its motion for summary judgment; on August 5, 2004, the superior court accepted Prentzel's third amended complaint, which identified Sergeant Papasodora by name for the first time and substituted his name for the "John Doe" trooper included in Prentzel's earlier complaint. On January 10, 2005, the superior court issued the order granting summary judgment, but neglected to reflect the substitution. In an amended final judgment issued June 24, 2005, however, the superior court entered judgment in favor of Sergeant Papasodora by name. Because Prentzel advances no actual or legal basis for concluding that the § 1983 immunity analysis should apply differently to Sergeant Papasodora than it applies to Troopers Scott and Gilmore, we use the same analysis of the § 1983 claim for all three defendants.

42. *Crawford v. Kemp*, 139 P.3d 1249, 1255 n. 10 (Alaska 2006).

43. *Id.* at 1255. We stated in *Prentzel I:*

 Troopers Scott and Gilmore are entitled to protection from the § 1983 claim on official immunity grounds if they can establish that a reasonable officer could have believed that their conduct was lawful, even if it actually was not.

 *Prentzel I*, 53 P.3d at 595 n. 40.

44. *Crawford*, 139 P.3d at 1255 (quoting *Van Sandt v. Brown*, 944 P.2d 449, 452 (Alaska 1997)) (internal quotation marks omitted).

45. *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

46. *Id.* at 202, 121 S.Ct. 2151.

■ Although it is undisputed that the troopers arrested Prentzel without a warrant and that no provision of Alaska law specifically authorized the warrantless arrest, we agree with the superior court's conclusion that the troopers are nonetheless entitled to qualified immunity from the § 1983 claim.

■ In general, "a violation of state law does not lead to liability under § 1983." [47] Thus, a violation of AS 12.25.030—the Alaska arrest statute that limits warrantless misdemeanor arrests—does not by itself establish a per se violation of the federal constitution. To defeat the troopers' claim of qualified immunity, Prentzel must instead show that the troopers' warrantless arrest amounted to a violation of the Fourth Amendment under clearly established federal law governing that amendment's meaning and scope. Prentzel fails to make this showing.

The United States Supreme Court's decision in *Atwater v. City of Lago Vista*[48] controls the point. There, the claimant, Atwater, challenged the constitutionality of her arrest for violating a Texas law by failing to use a seatbelt to protect a child seated in the right front passenger seat of Atwater's car. Relying on "founding-era common-law rules," Atwater urged the Supreme Court to hold that the Fourth Amendment's prohibition against unreasonable seizures forbids peace officers from making warrantless misdemeanor arrests except in cases of "breach of the peace"—that is, offenses involving or tending toward violence.[49] The Supreme Court rejected this argument, holding that "[i]f an officer has probable cause to believe that an individual has committed even a very

minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." [50]

In arriving at this conclusion, the Court relied on the historic common law tradition allowing officers to make warrantless arrests for minor violations. The Court emphasized that "both the legislative tradition of granting warrantless misdemeanor arrest authority and the judicial tradition of sustaining such statutes against constitutional attack are buttressed by legal commentary that, for more than a century now, has almost uniformly recognized the constitutionality of extending warrantless arrest power to misdemeanors without limitation to breaches of the peace." [51]

Although the Court in *Atwater* found that history convincingly supported the view that a warrantless misdemeanor arrest does not violate the Fourth Amendment, the Court went on to consider whether a more modern arrest rule barring this practice should be adopted.[52] In considering this question, the Court recognized that when Fourth Amendment claims arise from police conduct that was not definitely unlawful under common law at the time of the Constitution's framing, courts must decide the constitutional question by striking a balance between individual and societal interests.[53]

Applying this balance to cases involving warrantless misdemeanor arrests, the Court reasoned that "a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted

47. *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir.1998) (citing *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.")).

48. *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001).

49. *Id.* at 326–27, 121 S.Ct. 1536.

50. *Id.* at 354, 121 S.Ct. 1536.

51. For example, the Court cites *White v. Kent*, 11 Ohio St. 550 (1860), where the state court upheld a municipal ordinance permitting warrantless arrest of any person found violating any city ordinance or state law. *Atwater*, 532 U.S. at 342–45, 121 S.Ct. 1536. The court also cites 1 J. BISHOP, NEW CRIMINAL PROCEDURE § 183, at 103 (4th ed. 1895), where the commentator stated that "the power of arrest extends, possibly, to any indictable wrong in [an officer's] presence." *Atwater*, 532 U.S. at 344, 121 S.Ct. 1536.

52. *Id.* at 345–47, 121 S.Ct. 1536.

53. *Id.* at 346, 121 S.Ct. 1536 (citing *Wyoming v. Houghton*, 526 U.S. 295, 299–300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).

into an occasion for constitutional review." [54] In other words, the court held, "the law has never jelled ... [in a way suggesting that] warrantless misdemeanor arrests need constitutional attention." [55]

Given *Atwater's* holding that the Fourth Amendment is not implicated when police make warrantless arrests for minor offenses, it follows that the troopers' failure to comply with AS 12.25.030 cannot by itself establish that Prentzel's arrest violated the Fourth Amendment.

In addition, even though, at the time of Prentzel's arrest, Alaska's criminal code did not make violations of conditions of release a punishable offense, the troopers could "reasonably believe that they had probable cause to think a violation was being committed." The bail provisions of Alaska's Code of Criminal Procedure required all accused persons released on conditions before trial to be advised that "a warrant for the person's arrest will be issued immediately upon a violation or that the person may be arrested without a warrant for a violation of conditions of release." [56] This provision strongly suggests that the legislature considered all violations of pretrial release conditions to be conduct that would justify an arrest, regardless of whether a specific criminal statute required compliance with the particular condition violated.

Support for this view of the legislature's intent can be found in a related provision in Alaska's bail statutes, AS 12.30.070. Section .070 states: "Nothing in this chapter [Alaska Statutes, Title 12, Chapter 30, governing "bail"] shall prevent a court from exercising its power to punish for contempt." [57] Relying on this provision, the court of appeals has observed:

> When a defendant violates the conditions of release, the court may issue a warrant for the defendant's arrest, the court may revise the conditions of release to make them more onerous, and *the court can initiate contempt proceedings against the defendant.*[58]

Thus, AS 12.30.070 generally characterizes violations of conditions of release as conduct punishable as contempt. The contempt provisions in Alaska's Code of Civil Procedure bear out this conclusion. Specifically, AS 09.50.010(5) defines contempt to include "disobedience of a lawful judgment, order, or process of the court." [59] Under the provisions existing at the time of Prentzel's arrest, this form of contempt was punishable by a fine of not more than $100.[60]

Because the troopers in this case had ample grounds to believe—albeit incorrectly—that Prentzel was violating his conditions of release on a pending DWI charge, and because this conduct amounted to a contempt under AS 09.50.010(5), the troopers had probable cause to believe that Prentzel was committing a violation punishable under Alaska law at the time of his arrest. Thus, Prentzel is incorrect in asserting that probable cause could not have arisen because his conduct was not expressly proscribed.

■ For present purposes, it is unnecessary to consider whether Alaska law authorized a warrantless arrest for Prentzel's apparent act of contempt. The crucial point here, and the only point we decide, is that, under *Atwater*, the troopers' conduct would

---

54. *Id.* at 346–47, 121 S.Ct. 1536.

55. *Id.* at 351–52, 121 S.Ct. 1536.

56. AS 12.30.020(e).

57. AS 12.30.070.

58. *Lonis v. State*, 998 P.2d 441, 445 (Alaska App. 2000) (citing AS 12.30.070) (emphasis added).

59. AS 09.50.010 provides in relevant part:

> The following acts or omissions with respect to a court of justice or court proceedings are contempts of the authority of the court:

> ....

> (5) disobedience of a lawful judgment, order, or process of the court[.]

60. *See* former AS 09.50.020(a) *amended by* ch. 132, § 3, SLA 1998. This fine would have qualified the contempt to be considered a "violation" under Alaska Rule of Criminal Procedure 56(f), which defines "violation" as:

> (1) an offense as defined in AS 11.81.900(b)(61);
> (2) a traffic infraction as defined in Title 28 of the Alaska Statutes; or
> (3) any other offense under state or local law which is punishable only by a fine.

not have violated the Fourth Amendment even if Alaska law did not expressly authorize a warrantless arrest based on probable cause under these circumstances: "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." [61]

We thus affirm the superior court's ruling that Sergeant Papasodora and Troopers Scott and Gilmore are entitled to qualified immunity from Prentzel's claim under § 1983.

### 3. Claims against the supervising officers and the state

#### a. Section 1983 claim against the supervising officers

Prentzel argues that Colonel Godfrey and Captain Tanner violated his rights under § 1983 by showing deliberate indifference to the troopers' practice of making unauthorized arrests for violations of conditions of release and to the troopers' continued reliance on stale APSIN and FCC records in making those arrests.

■ To act with "deliberate indifference," an official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," must actually draw the inference, and then must disregard the risk.[62] In other words, Prentzel's evidence must show that Tanner and Godfrey were "subjectively aware of the risk" of ongoing system-wide problems and consciously disregarded that risk.[63] In *Prentzel I*, we observed:

A § 1983 claim would lie against Captain Tanner and Colonel Godfrey if Prentzel could show that they adopted, outside their official capacities, the customs or policies he alleges, causing violations of his civil rights. This would require evidence of their personal involvement in a violation of Prentzel's rights, and not simply evidence of their status as supervisors of Troopers Scott and Gilmore. A supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. A sufficient showing of personal involvement could include demonstrating that Captain Tanner and Colonel Godfrey created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, or showed deliberate indifference in supervising Troopers Scott and Gilmore.[64]

■ Prentzel presented no evidence to the superior court that Tanner and Godfrey were personally involved in his arrest. He bases his claim on the failure of the supervising officers to properly train the line troopers in the law authorizing warrantless arrests. In addition, Prentzel argues that it was part of the "ordinary course of business" that APSIN and FCC records were not updated for days or weeks following court dispositions. Prentzel maintains that the troopers' continued reliance on the stale records and the harm caused by their reliance is so obvious that "Tanner and Godfrey are either plainly incompetent or deliberately indifferent to the constitutional rights of citizens." He argues that the trier of fact should be permitted to infer that the supervising offi-

---

**61.** *Atwater*, 532 U.S. at 354, 121 S.Ct. 1536. We note that *Atwater* recognized an exception to the general rule that the Fourth Amendment would not be implicated by warrantless misdemeanor arrests. Under *Atwater*, such arrests might violate the Fourth Amendment if performed in an "extraordinary manner" causing unusual harm to physical and privacy interests. *Id.* at 354–55, 121 S.Ct. 1536. But here, as we have seen, the only potentially "extraordinary" circumstance Prentzel alleges is his own subjective conclusion that the troopers' enjoyed performing his arrest; moreover, as we have already pointed out, Prentzel failed to support this allegation with any

evidence raising a disputed question of fact. Accordingly, we find no arguable basis here for concluding that the troopers performed Prentzel's arrest in an extraordinary manner.

**62.** *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**63.** *Id.* at 829, 114 S.Ct. 1970.

**64.** *Prentzel I*, 53 P.3d at 595–96 (internal quotation marks and footnotes omitted).

cers were deliberately indifferent based on his evidence.

Prentzel's § 1983 claims against the supervising officers fail for several reasons. First, Prentzel has failed to show that Tanner and Godfrey were personally involved in his arrest or that they were subjectively aware of and deliberately indifferent to the risk that his rights would be violated. Prentzel did not present any evidence concerning policy-level decisions made by Tanner and Godfrey involving officer training. The closest Prentzel came to showing the existence or awareness of an ongoing problem involving warrantless arrests is Captain Tanner's deposition testimony, which acknowledged that Gilmore and Scott were "high producer[s]"—meaning they made many arrests. But Prentzel has failed to show what those arrests were for or what information the troopers relied on in making them. A history of frequent arrests does not by itself support an inference that unlawful arrests were routinely occurring, that the troopers regularly misinterpreted the law, that they often based their arrests on stale information, that they were improperly trained, or that their supervisors knew of these problems.

Moreover, the superior court could properly have declined to consider Prentzel's claim of delay in updating the APSIN and FCC records because the claim was untimely. And even if it had been timely, it would have failed because Prentzel offered no evidence that the delays were system-wide or that Tanner and Godfrey knew that the delays were occurring. Prentzel simply submitted copies of court dispositions for sixteen of his own arrests between 1986 and 2002; a stamp at the bottom of each disposition showed when it was forwarded to the FCC and the police department. Prentzel's case history is insufficient to support a reasonable inference that Tanner and Godfrey were aware of and consciously disregarded system-wide recordkeeping delays.

As the superior court put it, "[b]ecause Prentzel's allegations towards Tanner and Godfrey are generalized allegations of their status as supervisors, they are insufficient to support a claim under § 1983." [65]

#### b. State-law claims for negligent training and supervision

Prentzel argues that the state, Captain Tanner, and Colonel Godfrey owed a duty under Alaska law (1) to adequately train state troopers so they would not arrest persons without a warrant for "nonexistent offenses," and (2) to adequately train state troopers concerning the delay in updating the APSIN computer databases and FCC records regarding conditions of release. He alleges that the state and the supervising officers negligently performed these duties and that he is entitled to summary judgment for negligent supervision and training.[66]

These arguments fail for the same basic reason that Prentzel's federal supervisory claims failed: Prentzel did not provide any evidence of system-wide problems involving delayed recordkeeping resulting in unlawful arrests or of any supervisory negligence in creating or failing to correct such problems.

In his deposition of Trooper Dane Gilmore, Prentzel did not question Gilmore about the training he had received regarding the laws

---

**65.** *See id.* at 596 (noting that Prentzel's arguments as to how Godfrey and Tanner acted outside the scope of their official capacities could "well make his § 1983 claim vulnerable to an immunity defense on summary judgment"); *see also Jeffers v. Gomez,* 267 F.3d 895, 916 (9th Cir.2001) (holding that prison director was entitled to qualified immunity from § 1983 failure-to-train claim because plaintiff failed to show direct involvement in his injury or deliberate actions at the policy-making level).

**66.** In his reply brief Prentzel attempts to fashion his negligent supervision and training claim as a "negligent recordkeeping" claim; that is, he argues that in addition to training the troopers in the limitations of the APSIN and FCC databases, the state and the supervising officers also owed a duty to maintain those records adequately. But Prentzel did not make that argument to the superior court in his motion for summary judgment. Accordingly, we need not consider it now because "[a]s a rule, a party may not advance new issues or theories on appeal to secure reversal of a lower court decision." *Clark v. Greater Anchorage, Inc.,* 780 P.2d 1031, 1035 n. 4 (Alaska 1989) (citing *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985)).

of arrest. Prentzel merely asked Gilmore whether he had been trained to look to AP-SIN as a source of information when making arrests; Gilmore answered that he had been. Prentzel did not ask Gilmore about any specific training he received from Captain Tanner or Colonel Godfrey. In Prentzel's deposition of Trooper Daniel Scott, Scott testified that he had been trained to consider the FCC as a potential source of information regarding conditions of release. Scott also testified that he had been trained to rely on FCC and APSIN records when making arrests, but he did not state that he received this training from Godfrey or Tanner. Finally, in the deposition of Captain Tanner, Tanner testified that state troopers receive their initial training in the public safety academy and that he was responsible for ensuring that state troopers were annually retrained. Tanner further testified that during his tenure as captain from 1997 to 1999, he made sure that the troopers under his command, including Troopers Gilmore and Scott, received this regular retraining.

Apart from this brief deposition testimony, Prentzel presented no other evidence regarding the training procedures and policies of the Alaska State Troopers. Furthermore, Prentzel failed to show that the APSIN and FCC records were so inaccurate that there was a need to train troopers not to rely on them. To show that the databases were inaccurate, Prentzel merely presented copies of the court dispositions for sixteen of his own arrests between 1986 and 2002. Of the sixteen, one was transmitted the day after disposition, five were transmitted within seven days, five were transmitted within one to two weeks, two were transmitted between two to three weeks, and three after three weeks. Although there were apparent delays in forwarding Prentzel's records, this isolated evidence does not establish that the system as a whole was inaccurate and unreliable. And Trooper Scott testified that he had never been aware of APSIN being inaccurate and, based on his experience, believed that it was updated quickly.

In sum, none of the evidence presented by Prentzel leads to the inference that the defendants breached a duty of care to properly supervise and train the troopers. By all accounts, the troopers received regular annual training and Captain Tanner ensured that this training occurred.

We affirm the superior court's order granting summary judgment to the state defendants on all of Prentzel's claims.

## B. Prentzel's Late Motions and Fourth Amended Complaint

The superior court struck as untimely Prentzel's motion to file a fourth amended complaint, his motion for an extension of time, and his motion for summary judgment. Prentzel attempted to justify his tardy filings by showing that they were late because of "excusable neglect." He asserted below that four days before the October 4 filing deadline, he was called out for a job that he could not refuse because it was "his first and only opportunity for substantial gainful employment this year." He also claimed that he had "underestimated the amount of time required to perform all the work involved in articulating all of his claims and defenses in a memorandum of law."

The court explained its decision to strike the untimely motions by stating that "[t]he sanction of striking these late-filed pleadings following two previous continuances of the trial to allow Prentzel to be prepared is reasonable under the circumstances and does not alone end this litigation." Moreover, the court stated that it would consider Prentzel's late pleadings to the extent that they responded to the state's pending motion for summary judgment.

Prentzel argues that the superior court abused its discretion in striking his motions as untimely. He characterizes this action as "litigation-ending sanctions," which are generally disfavored and only permitted in "extreme circumstances." He also claims, mistakenly, that the court actually struck the third amended complaint, rather than just the third *motion* to amend the complaint. Under this view, the court's decision ended the litigation because "it had the effect of deciding the [state's] motion for summary judgment without considering plaintiff's admissible evidence concerning the deficient system relied upon by the troopers to obtain

information about conditions of release imposed on persons."[67]

We review procedural decisions of the superior court for abuse of discretion.[68] This includes review of decisions to deny leave to file an amended complaint,[69] to grant or deny an extension,[70] and to deny late dispositive motions.[71] We "will reverse a ruling for abuse of discretion only when left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[72]

### 1. Motion to amend the complaint

In general, in the absence of a motion filed on the eve of trial, leave to amend is freely granted unless it would result in an injustice.[73] Here, Prentzel's motion to amend was filed on the eve of trial—in fact, on the eve of the third scheduled trial. We are not persuaded that denying Prentzel leave to amend his complaint again resulted in an injustice. The superior court pointed to all the continuances it had granted and deadlines Prentzel had missed, and appropriately concluded that it would not "allow a motion to amend the complaint filed on the eve of trial that raises new issues requiring additional discovery and the continuance yet again of this trial." We conclude that the superior court did not abuse its discretion in refusing to grant Prentzel leave to file a fourth amended complaint.

### 2. Motion for summary judgment

Prentzel argues that striking his other motions impermissibly ended the litigation be-cause the court decided the state's summary judgment motion without giving adequate consideration to the admissible materials he had presented with the rejected motions. In *Sandstrom & Sons, Inc. v. State* we held that the superior court improperly assessed litigation-ending sanctions against a party when it dismissed the case after that party failed to comply with a discovery order.[74] Although the party's conduct did deserve sanction, we determined that the superior court should have explored sanctions other than dismissal.[75] The superior court in this case correctly distinguished *Sandstrom & Sons, Inc.* from Prentzel's situation.

The court indicated that it treated Prentzel's motion for summary judgment as an opposition to the state's motion to the extent that the motion was responsive. Although the court did not address every issue raised in the third amended complaint, it stated that it had reviewed "all of the pleadings and attached affidavits, including Plaintiff's most recent opposition to Defendant's motion for summary judgment." The order granting summary judgment to the troopers directly quotes Prentzel's affidavit and also discusses and distinguishes cases Prentzel cited in his brief. Moreover, the court itself noted that what ended the litigation was "the court's ruling granting the State's Motion for Summary Judgment on its merit[s]."

### 3. Motion for an extension of time to file motion for summary judgment

Prentzel also argues that the superior court abused its discretion in denying his

---

67. The record shows that the superior court did not strike the third amended complaint. The court had already granted Prentzel leave to file a third amended complaint and the state had already answered. In its Order Regarding Miscellaneous Motions, the court stated that it was striking the "Third Motion to Amend the Complaint"—in other words, the motion to file a fourth amended complaint. The court also stated that it rejected Prentzel's motion for summary judgment to the extent it "raise[d] new matters beyond the Third Amended Complaint."

68. *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000).

69. *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1034 (Alaska 2004).

70. *Sheehan v. Univ. of Alaska*, 700 P.2d 1295, 1297 (Alaska 1985).

71. *See Taranto v. N. Slope Borough*, 992 P.2d 1111, 1112 (Alaska 1999).

72. *Ruckle*, 85 P.3d at 1034 (quoting *DeSalvo v. Bryant*, 42 P.3d 525, 527–28 (Alaska 2002)).

73. *Miller v. Safeway, Inc.*, 102 P.3d 282, 293 (Alaska 2004).

74. *Sandstrom & Sons, Inc. v. State*, 843 P.2d 645, 648 (Alaska 1992).

75. *Id.*

motion for an extension of time to file a motion for summary judgment. He cites several factors to support his contention: he filed his motion before the deadline for opposing the troopers' motion for summary judgment and before the court actually granted summary judgment; he diligently conducted and provided discovery throughout the action; his papers clearly established a prima facie case for denial of civil rights; and economic necessity compelled him to take a job, which caused his late filing. Prentzel further contends that his status as a pro se litigant excuses his tardiness, arguing that the pleadings of pro se litigants should be held to " 'less stringent standards than those of lawyers,' particularly when 'lack of familiarity with the rules' rather than 'gross neglect or lack of good faith' underlies litigants' errors."

We have held that the superior court "must inform a pro se litigant of the specific defects in his [pleadings] and give him an opportunity to remedy those defects." [76] But there were no specific defects in Prentzel's late-filed motions that required correction: the motions were simply late. Prentzel cannot and does not claim that the court failed to notify him of the filing deadlines; on the contrary, the court continued the trial twice at Prentzel's request and issued new filing deadlines each time. What's more, while the court did not grant Prentzel additional time to refine his motion for summary judgment, it nevertheless considered the motion that Prentzel actually filed, which consisted of an affidavit, supporting exhibits, and a lengthy memorandum.

Ordinarily, "pro se litigants who make good faith efforts to comply with court rules should not be held to strict procedural requirements." [77] But Prentzel does not show that he made a good faith effort to comply with the superior court's deadlines. Prentzel claims that he underestimated the amount of work a motion for summary judgment would require and then unexpectedly received a job offer that he could not afford to decline. But while these circumstances may be understandable, Prentzel made no effort to inform the court of his difficulties in a timely fashion. He thus fails to provide a persuasive justification for his untimely filings in the third round of deadlines provided by the court. This failure, combined with the superior court's decision to accept the untimely materials as responsive pleadings, persuades us that the superior court did not abuse its discretion in denying Prentzel's motion for an extension to file his motion for summary judgment.

## C. Request for Deposition

The state's pretrial witness list named Randy Olsen. By the time of Prentzel's last scheduled trial, Olsen was a superior court judge in Fairbanks; but he had previously served as an assistant attorney general and, in that capacity, had been assigned to represent the state in opposing Prentzel's claims. While working on the case, Olsen learned that Prentzel had never been credited for the two days he spent in jail after his October 1998 arrest. Olsen then arranged for him to be released two days early in a new case for which he was serving a sentence. In listing Olsen as a witness, the state evidently planned to have him testify about these efforts to mitigate Prentzel's damages.

Before the first scheduled trial date, Prentzel sought a continuance of trial in order to conduct discovery. In addition to deposing the named defendants, he sought to depose Judge Olsen to gain information about this custody-release arrangement, which Prentzel characterized as an affirmative defense of the state. The state did not oppose the extension of time to depose the named defendants but took no position as to Judge Olsen. The superior court granted Prentzel's motion to extend the deadline for deposing the named defendants, but did not authorize an extension of time to depose Judge Olsen.

Prentzel nevertheless scheduled Judge Olsen's deposition. The state moved to cancel it, arguing that the court was authorized under Civil Rule 26(c) to issue an order limiting discovery in order to "protect a par-

**76.** *Collins v. Arctic Builders,* 957 P.2d 980, 982 (Alaska 1998).

**77.** *Noey v. Bledsoe,* 978 P.2d 1264, 1270 (Alaska 1999).

ty or person from annoyance, embarrassment, oppression, or undue burden or expense." The state also pointed out that the court was authorized under Civil Rule 45(b) to void or modify a subpoena if it was unreasonable and oppressive. The superior court granted the state's order to quash the subpoena and cancel the deposition.

On appeal Prentzel argues that the superior court abused its discretion in denying him the opportunity to depose Judge Olsen because "[c]ertainly his testimony was relevant." He notes that Olsen was on the state's witness list, had testimony regarding the state's mitigation of Prentzel's damages based on the early release from custody, and had knowledge of the trooper practice of making arrests without a warrant. Prentzel also argues that allowing the deposition to go forward would not have prejudiced the state and would not have caused undue delay, because discovery remained open on other issues.

■ We review discovery orders and sanctions for abuse of discretion, but review de novo whether the trial court considered the appropriate factors when issuing a discovery order.[78] Under Civil Rule 26(b)(2), the superior court may limit the use of discovery methods such as depositions if it determines that

> the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.[79]

The court may order that disclosure or discovery not be had when necessary to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." [80]

■ We hold that the limit on discovery in this case was not manifestly unreasonable, and that the superior court did not abuse its discretion in declining to allow Prentzel to depose Olsen. Prentzel argues that he needed to depose Olsen because he had knowledge of the troopers' practice of making warrantless arrests. But Prentzel failed to raise this issue in the superior court. The only purpose for deposing Olsen he offered below was to learn about "an affirmative defense of the defendants"—a purpose that is moot in light of the superior court's summary judgment ruling. We reject Prentzel's newly raised theory of relevance as waived and find no abuse of discretion in denying the deposition for the purpose Prentzel advocated below.[81]

### D. Attorney's Fees and Costs

In March 2000 the state made of an offer of judgment for $1,000, which Prentzel rejected. After granting summary judgment to the state, the superior court found that the state was the prevailing party. The court awarded $13,662.02 in attorney's fees to the state—$1,609.42 in pre-offer-of-judgment fees under Civil Rule 82(b)(2), and $12,052.60 in post-offer fees enhanced under Civil Rule 68(b)(2). This award was significantly less than the original amount requested by the state because the court omitted time related to the § 1983 claim and the first appeal and lowered the state's hourly rate to fifty percent of the amount originally requested by the state. Prentzel challenges the award.

■ After the superior court entered the attorney's fee award in June 2005, we held in *Ellison v. Plumbers and Steam Fitters Union Local 375* that Rule 68(c) allows a party to elect the greater of Rule 82 or Rule 68

**78.** *Peter v. Progressive Corp.,* 986 P.2d 865, 867 (Alaska 1999).

**79.** Alaska R. Civ. P. 26(b)(2)(iii).

**80.** Alaska R. Civ. P. 26(c).

**81.** Our order affirming the superior court's dismissal of Prentzel's claims also makes it unnecessary to consider Prentzel's conclusory argument that the court erred on denying his request for an injunction precluding the troopers from arresting Prentzel in the future. To the extent that the injunctive relief depends on the merits of Prentzel's primary claims, Prentzel's request is moot. To the extent that the relief is unrelated to the merits of Prentzel's principal claims, it is not properly requested in the context of this action.

fees, but not both.[82] Our ruling in *Ellison* is controlling here and precludes the state from claiming Rule 82 fees in addition to the larger award it received under Rule 68.

Apart from this error, we find no abuse of discretion in calculating the award of attorney's fees. Prentzel argues that the state's fee bill was "padded." But the state attested that it eliminated fees for duplicative efforts resulting from the case getting passed to many attorneys, and did not charge for general research or general procedures that benefitted the state; in total, the state requested fees for less than fifty percent of the total hours that it actually spent in defending the case.

 Prentzel also argues that the award of attorney's fees should have been declined because it could deter other similarly situated civil-rights litigants from bringing actions in good faith. But the superior court accounted for Prentzel's status as a pro se indigent litigant by cutting the state's hourly billing rate in half. Moreover, the court ensured that time spent on Prentzel's civil rights claim and on his first appeal was not included in the award. Considering that the attorney's fee award will be reduced even more once the Rule 82 fees are eliminated, we cannot say that the award is manifestly unreasonable. Thus, although we vacate the fees awarded under Rule 82, we affirm the award under Rule 68 and remand for entry of a modified judgment reflecting only that award.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's order granting summary judgment and all other rulings encompassed in its final judgment except the award of attorney's fees under Rule 82. We VACATE that award and REMAND for entry of an attorney's fees award consistent with this opinion.

**82.** *Ellison v. Plumbers & Steam Fitters Union* *Local 375,* 118 P.3d 1070, 1078 (Alaska 2005).